**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**Nashville Division**

| | | |
|---|---|---|
| **United States ex rel.** | ) | |
| **Marc Osheroff** | ) | **Civil Case No. 3:10-cv-1015** |
| | ) | **Judge SHARP** |
| **Plaintiff-Relator,** | ) | |
| | ) | |
| **v.** | ) | **Jury Trial Requested** |
| | ) | |
| **HealthSpring, Inc.** | ) | |
| **HealthSpring of Florida, Inc.** | ) | |
| **Leon Medical Centers, Inc.** | ) | |
| **Benjamin Leon, Jr.** | ) | |
| | ) | |
| **Defendants**. | ) | |

**FIRST AMENDED COMPLAINT**

*"More from Medicare*." [1]
HealthSpring Corporate Motto

**Color televisions and wide seating allow our patients to feel as comfortable as possible during their trip.** . . . **a patient can expect to be phoned by their personal driver prior to arrival.** When the driver reaches a patient's home, **they take them from their door to the bus,** helping them each step of the way. .... The forethought and prudence with which **Leon Medical Centers has developed its free and unlimited transportation services** affords patients with much needed access to care providing the best possible attention and the care necessary to keep them healthy.[2]
[emphasis supplied]

---

[1]     *"More from Medicare*. More from life." Exhibit A, Healthspring Annual Report, p1

[2]     Exhibit E http://www.leonmedicalcenters.com/English/transportation.html (as of 9/10/10), same in Spanish http://www.leonmedicalcenters.com/Spanish/transportation.html

1

# Contents

Introduction ........................................................................................................... 5

I. Jurisdiction and Venue .................................................................................... 10

II. Parties ............................................................................................................. 11

  A. Plaintiffs ..................................................................................................... 11

  B. Defendants ................................................................................................. 16

  C. All Defendants............................................................................................ 17

III. Statutory and Regulatory Programs Applicable to Defendants' FCA Violations ................... 18

  A. Traditional Medicare (Parts A & B) ......................................................... 18

  B. Medicare Advantage (Parts C & D) .......................................................... 19

  C. Current MA Plan Enrollees are Future Prospective Enrollees ................... 21

  D. Federal Anti-Kickback Statute .................................................................. 23

  E. The Anti-Inducement Statute .................................................................... 24

  F. The False Claims Act ................................................................................. 25

  G. Medicare Improvements for Patients and Providers Act of 2008 (MIPPA)..................... 26

  H. CMS Guidance on Meals and Transportation............................................ 26

    1. Guidance on Routine Transportation....................................................26

    2. Guidance on Meals ..............................................................................27

IV. Detailed Allegations ....................................................................................... 28

  A. Offers of Valuable Meals and Transportation Violate the AKS and AIS ......................... 28

    1. Relator's Knowledge of Transportation Violations................................28

    2. Particulars of Offers.............................................................................29

    3. General Allegations re Meals ...............................................................31

4. The Meals and Transportation are Valuable and Exceed "Nominal Value" ............32

5. The Meals and Transportation Offered Is Not Need Based....................................33

6. Defendants Promote Meals and Transportation to Improve Sales ........................34

B. Defendants Conspired to Commit the Above Violations .................................................. 37

1. The Parties' Agreements ........................................................................................37

2. The Parties' Acts in Furtherance of their Conspiracy ...........................................37

3. The Parties' Intent to Defraud................................................................................37

C. Defendants Acted Knowingly ........................................................................................... 37

1. All Defendants Know of the Clinics' Offers of Meals and Transportation............37

2. HealthSpring Knows the Defendant Clinics' Conduct Is Unlawful ......................38

3. HealthSpring's Express Certifications Show Knowledge of Unlawful Conduct....39

4. MIPPA's Prohibitions Made Defendants' Conduct Knowingly Unlawful..............43

5. The Managed Care Manual Informs Defendants of Their Unlawful Conduct.......43

6. The Anti-Inducement Statute Informs Defendants of Their Unlawful Conduct ....44

7. The OIG Informs Defendants of Their Unlawful Conduct ....................................44

V. Counts I to VIII....................................................................................................................45

Count I -- 31 U.S.C. §3729(a)(1)(A): False or Fraudulent Claims Presented to Medicare

Parts B, C, and D by the Clinics ..................................................................................... 45

Count II -- 31 U.S.C. §3729(a)(1)(B): False Statements Material to Claims Under Medicare

Parts B, C, and D by the Clinics ..................................................................................... 47

Count III -- 31 U.S.C. §3729(a)(1)(A): False or Fraudulent Claims Presented to Medicare

Parts C and D by the HealthSpring Defendants ............................................................. 49

Count IV -- 31 U.S.C. §3729(a)(1)(B): False Statements Material to Claims Presented to

Medicare Parts C and D by the HealthSpring Defendants .............................................. 52

Count V -- 31 U.S.C. §3729(a)(1)(A): False or Fraudulent Claims the HealthSpring

Defendants Caused the Leon Clinics to Present to Medicare Parts B, C, and D............. 54

Count VI -- 31 U.S.C. §3729(a)(1)(A): False or Fraudulent Claims the Leon Clinics Caused

the HealthSpring Defendants to Present to Medicare Parts C and D ............................. 55

Count VII -- 31 U.S.C. §3729(a)(1)(C): False Claims Act Violations of Benjamin Leon, Jr.56

Count VIII -- 31 U.S.C. §3729(a)(1)(C): False Claims Act Violations for Conspiracy ........ 57

Prayer for Relief ......................................................................................................................... 57

Exhibit List .................................................................................................................................. 60

4

**Introduction**

1.   This *qui tam* action turns upon the common sense principle that "there's no such thing as a free lunch."[3] In other words, *someone* always pays the hidden cost of anything a business offers to the public for free.

2.   In the instant case, the hidden cost of free meals and luxury transportation offered by Defendants[4] to Miami-area Medicare beneficiaries are paid for by federal taxpayers.

3.   It is no accident that costs of healthcare in Miami and Dade County are the highest in the nation.  Supposedly "free" services and entertainment of the sort offered by the Leon Clinics, but for all practical purposes provided nowhere else in the country outside of Miami-Dade County,[5] add to the exorbitant healthcare tab picked up by the Medicare program in Miami.

4.   There is also another dangerous factor at play in the provision of free lunch and luxury transportation to Medicare beneficiaries -- the principle of reciprocal altruism, which drives up healthcare utilization rates.

---

[3]      This was the title of a 1975 book by Nobel-prize-winning economist Milton Friedman. The expression has its origin in the practice of 19th Century bars of offering "free lunch" as a way to entice patrons to spend their money on drinks that paid for the cost of the food and generated a profit for the saloon keeper.  *See generally* http://en.wikipedia.org/wiki/There_ain't_no_such_thing_as_a_free_lunch (last visited November 22, 2011).

[4]      The medical centers operated by Defendant Leon Medical Centers, Inc. and Benjamin Leon, Jr. are hereinafter collectively referred to as "the Leon Clinics," or simply "the Clinics." Defendants HealthSpring, Inc. and HealthSpring of Florida, Inc. are hereinafter collectively referred to as "the HealthSpring Defendants" or simply "HealthSpring."

[5]      The exception may be New York's immigrant neighborhoods, but healthcare costs in New York are second only to Miami's.

5. Human nature dictates that recipients of gifts and meals feel obligated to reciprocate.[6]

Defendant HealthSpring recognizes this and instructs its employees that gifts have "the potential to unduly influence judgment or create a feeling of obligation" [7]

6. Simply put, most people do not want to feel that they are taking advantage of the generosity of others. Therefore, those who enjoy free meals, services and white-gloved luxury transportation to and from the Leon Clinics feel obligated to order expensive medical services whether they really need them or not, driving up healthcare utilization rates.[8]

7. Another problem created by the offering of free services is that other providers who cannot offer such inducements for legal, ethical or financial reasons are placed at a distinct competitive disadvantage.[9]

---

[6]    Research shows that even highly compensated professionals such as physicians are influenced by very small gifts. *See* THE SCIENTIFIC BASIS OF INFLUENCE AND RECIPROCITY: A SYMPOSIUM (Amer. Ass'n Medical Colleges, 2007). "One [physician] asked indignantly, 'you don't really think that I would let a pizza lunch influence my decision making process for my patients, do you?' " The answer is a resounding and consistent: YES. *Id.* The symposium reviewed the growing body of neurobiological and psychosocial evidence related to the effects of gifts on recipients' [doctors'] choices and decisions. It addressed the biasing effects of influence and reciprocity on decision-making and found "remarkable" consistency of findings from several scientific approaches. *Id, at p.2.*

[7]    "The general purpose of gifts and favors in a business context is to create goodwill. If they do more than that, and have the potential to unduly influence judgment or create a feeling of obligation, employees should not accept them." Ex. F, HealthSpring Code of Business Ethics.

[8]    Few judges would tolerate a party's offer of *unlimited* free lunches to a clerk or judicial assistant. Such gifts or favors might subconsciously bias the assistant in favor of the party or create a sense of obligation. Similarly, the Medicare program does not want persons who are ordering medical services at the government's expense, whether they are doctors or patients, to feel obligated to order services as the result of gifts or favors.

[9]    The OIG stated in its comments to safe harbor regulations:

6

8.   For these reasons, the federal Anti-Kickback Statute , 42 U.S.C. § 1320a-7b, makes it a crime for healthcare providers even to *offer* remuneration, whether in cash or in kind, to induce any person to purchase or order healthcare services paid for by a federal healthcare program:

> **(b) Illegal remunerations**
>
> * * * * *
>
> **(2)** whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person . . . .
>
> **(B)** to purchase . . . [or] order . . . any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program, shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

9.   By well-settled authority, "remuneration" prohibited by the Anti-Kickback Statute includes "valuable gifts that are intended to induce patients to order services paid for in whole or in part by a Federal health care program." HHS OIG Advisory Opinion No. 00-7. *See*, CMS Managed Care Manual, Chapter 4, §30.5 – *Meals;* Chapter 3, and Medicare Marketing Guidelines, 70.2.1 - Exclusion of Meals as a Nominal Gift.

10.   The Anti-Inducement Act, 42 U.S.C.§ 1320a-7a, also imposes civil monetary penalties upon any person who "offers to or transfers remuneration to any individual eligible for benefits

---

"[T]he law does not make increased cost to the government the sole criterion of corruption. In prohibiting 'kickbacks,' Congress need not have spelled out the obvious truisms that, while unnecessary expenditure of money earned and contributed by taxpaying fellow citizens may exacerbate the result of the crime, kickback schemes can freeze competing suppliers from the system, can mask the possibility of government price reductions, can misdirect program funds, and, when proportional, can erect strong temptations to order more drugs and supplies than needed."
http://oig.hhs.gov/fraud/docs/safeharborregulations/072991.htm

under [Medicare] that such person knows or should know is likely to influence such individual to order or receive from a particular provider, practitioner, or supplier any item or service for which payment may be made, in whole or in part, under [Medicare]."

11.    The Anti-Inducement Statute defines "remuneration" as including "transfers of items or services for free or for other than fair market value."  42 U.S.C. § 1320a-7a (i) (6).

12.    Benjamin Leon, Jr., the Leon Clinics and the HealthSpring Defendants have violated the Anti-Kickback Statute and the Anti-Inducement Statute by routinely offering free lunches, limo rides, and other services of more than nominal value to patients to induce them to patronize the Leon Clinics and enroll in the HealthSpring Medicare Advantage plans at the expense of federal healthcare programs.

13.    Mr. Leon, the Leon Clinics and the HealthSpring Defendants go far beyond the provision of gifts of nominal value, marketing the Leon Clinics as social centers to which senior and underprivileged patients are chauffeured in free limousine-class vehicles to enjoy free meals, take-away food, personal pampering, bingo, dominoes, raffles, music and dance as part of an expense-free social or entertainment outing of great cost to the clinics and significant value to their patrons.

14.    The Leon Clinics and the HealthSpring Defendants have executed Medicare Enrollment Applications acknowledging that they "understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with [Medicare] laws, regulations, and program instructions (including, but not limited to, the Federal Anti-kickback statute . . .), and on the supplier's compliance with all applicable conditions of participation in Medicare."

15.    Violations of the Anti-Kickback Statute and the Anti-Inducement Statute can form the basis for violations of the False Claims Act. Congress specifically amended the Anti-Kickback Statute on March 23, 2010, to clarify that "a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of [the FCA]." Patient Protection and Affordable Care Act of 2010 ("PPACA"), Pub. L. No. 111-148 § 6402(f), 124 Stat. 119, 759 codified at 42 U.S.C. § 1320a-7b(g).

16.    By knowingly submitting tainted fee-for-service claims to Medicare Parts B, C and D in violation of the Anti-Kickback Statute and the Anti-Inducement Statute, the Leon Clinics are liable for submission of false claims in violation of the False Claims Act. *See McNutt v. Haleyville Medical Supplies, Inc.*, 423 F. 3d 1256 (11th Cir. 2005).

17.    By knowingly utilizing inducements to enroll patients in the HealthSpring Defendants' Medicare Advantage plans and knowingly submitting tainted capitation claims to the HealthSpring Defendants for payment under such plans, Mr. Leon and the Leon Clinics have caused the HealthSpring Defendants to submit tainted capitation claims and cost data to Medicare Parts C and D in violation of the Anti-Kickback Statute, the Anti-Inducement Statute and the False Claims Act.  *See U.S. ex rel Hutcheson v. Blackstone Medical, Inc*., 647 F.3d 377 (1st Cir. 2011).

18.    The HealthSpring Defendants' Medicare Advantage Contracts also make compliance with the Anti-Kickback Statute and the Anti-Inducement Statute a pre-condition to payment under Medicare Parts C & D.  The contracts state specifically, that "The MA Organization agrees to comply with . . . [f]ederal laws and regulations designed to prevent or ameliorate fraud, waste, and abuse, including, but not limited to . . . the anti-kickback statute . . . ."

9

19.    The HealthSpring Defendants are liable for knowingly presenting tainted capitation claims and cost data to Medicare Parts C & D for patients enrolled in their Medicare Advantage plans in violation of the Anti-Kickback Statute, the Anti-Inducement Statute and the False Claims Act and for causing the Leon Clinics to submit tainted fee-for-service claims to Medicare Parts B, C and D.

20.    Mr. Leon, as the founder of the Leon Clinics and the Medicare Advantage plan now operated by the HealthSpring Defendants, knowingly devised the illegal inducement scheme at issue in this case and caused it to be executed by others.  He is therefore liable both as a principal wrongdoer and secondarily for causing the Leon Clinics and the HealthSpring Defendants to violate the Anti-Kickback Statute, the Anti-Inducement Statute and the False Claims Act.

21.    All Defendants are liable for conspiring to violate the Anti-Kickback Statute, the Anti-Inducement Statute and the False Claims Act.

### I.  Jurisdiction and Venue

22.    This civil action arises under the Federal False Claims Act, 31 U.S.C. § 3729 *et seq*.

23.    Jurisdiction over this action is vested in this Court by 31 U.S.C. § 3732, which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. § 3729 and § 3730; pursuant to 28 U.S.C. § 1331, which confers federal subject matter jurisdiction; and pursuant to 28 U.S.C. § 1345 because the United States is a plaintiff.

24.    This Court has personal jurisdiction over Defendants under 31 U.S.C. § 3732(a) because one or more Defendants can be found, resides, or transacts business in this District, and because acts proscribed by 31 U.S.C. §3729 occurred in this District. One or more Defendants have also made, used, or caused to be made or used, false or fraudulent records in this District to get false or fraudulent claims paid or approved by the Government.

10

25.    Venue is proper in this district under 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391.  Defendant HealthSpring has its principal place of business in this district at 9009 Carothers Parkway, Franklin, Tennessee 37607 and many of the key corporate witnesses in this case reside in this district.

26.    The facts and circumstances that give rise to Defendants' violations of the False Claims Act have not been publicly disclosed in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party; in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; nor from the news media.

27.    Relator brings this action based on his direct knowledge and also on information and belief. Relator's allegation are independent of and materially add to any publicly disclosed allegations or transactions, thus to the extent there has been a public disclosure, Relator is an "original source" as that phrase is used in the False Claims Act, 31 U.S.C. § 3730(e)(4).

28.    Relator voluntarily provided to this District's United States Attorney, and to the Attorney General of the United States, pursuant to a joint prosecutorial and common interest privilege statement, a summary of known material evidence and information related to the Complaint, in accordance with the provisions of 31 U.S.C. § 3730(b)(2).

## II. Parties

### A.  Plaintiffs

29.    Plaintiff, the **United States of America** (hereinafter "the Government"), funds the provision of medical care to senior citizens through the Medicare program.

30.    Plaintiff-Relator **Marc Osheroff** ("**Relator**"), here sues for himself and on behalf of the United States to recover damages and civil penalties arising from Defendants' actions in violating the Federal False Claims Act, 31 U.S.C. § 3729 *et seq.*

11

31.    Relator is a resident of Broward County, Florida, who works in Miami-Dade and Broward counties, and has direct and personal knowledge of the allegations herein.

32.    Relator is a successful entrepreneur who founded and operated successful businesses in varied fields including electronics, motorcycles, commercial real estate, medical office buildings, parking facilities, warehouses, and others. He has enjoyed success in retail sales, as a wholesaler, and as a business and real estate investor.

33.    Since Relator's money is at risk in his businesses, it is his practice to approach any investment in a new business by first performing "market research" to ensure a businesses' viability.

34.    Although Relator has no academic degrees beyond high school and has completed no business courses or marketing courses he has been very successful as a result, in part, of his ability to perform market research.

35.    Since he has no formal marketing education, his marketing research is informal. He speaks to many people and asks many questions. This approach helps him decide which investments to make, which to avoid, when to buy, and when to sell.

36.    Since 1993 Relator has had physician tenants in his buildings and has known that medical clinics are very profitable.

37.    In 1996 Relator founded The Centre of Cosmetic Surgery with a physician partner. Relator and his partner contemplated expanding that clinic to include a more general clinic and around 1999 Relator began negotiations to purchase or merge with the Florida Center of Cosmetic Surgery.

38.    In 2000 Relator began to operate his first medical office building and continued to research medical clinics and the marketing of medical clinics.

12

39.    During the early 2000s Relator continued to research opportunities to found clinics and to purchase and operate medical office buildings.

40.    Around the same time period, along with a physician partner, Relator began to investigate opening an outpatient surgery and rehabilitation center in the medical office building he owned on the campus of the hospital that is now called Jackson North Medical Center.

41.    As the business partner, it was Relator's job to evaluate the Center's market potential. Relator researched marketing the businesses, which involved not just the marketing of outpatient surgery and rehabilitation, but research to develop an understanding of the competition for patients by clinics such as those operated by the Defendant clinics.

42.    Relator's research showed that the competition for patients faced barriers created by Defendants' clinics and others, who compete for patients using unlawful inducements. Once these clinics "owned" the patients by virtue of continued inducements, the patients were removed from the market. For these marketing challenges and other reasons, eventually Relator decided to drop this business idea.

43.    Around 2006, along with a physician partner, Relator began to develop plans for an MRI (magnetic resonance imaging) clinic since he had already expended money for the build-out of an office including high amperage electricity, extra air conditioning for the MRI hardware, and copper lining in the walls. Relator and his partner also acquired MRI hardware. As the business person for the MRI clinic, it was Relator's job to evaluate the market potential. Again, Relator researched marketing medical businesses, which involved not just the marketing of an MRI clinic, but an understanding of the competition for patients with other businesses, such as those run by Defendants.

44. Relator found that Leon (and others) compete for patients using unlawful inducements. Once Leon "owned" the patients by virtue of continued inducements, those patients were removed from the market. Defendants (and others) could then choose whether to install their own MRI hardware or negotiate a much less profitable arrangement with an office such as Relator's. That was one of the reasons Relator did not pursue the business of an MRI clinic.

45. In mid-2007 Relator learned that Defendant Benjamin Leon sold *part* of his Leon Clinic's Hialeah-based business (selling the Medicare Advantage plans to HealthSpring and keeping the provider clinics) for approximately $400,000,000, which further stimulated Relator's interest in the clinic business. See Exhibit A at 43; Exhibit D at 5.

46. From the early 2000s to the present Relator continued his interest in owning and operating a clinic. In researching what would influence people to utilize a clinic, Relator spoke with many people and asked many questions. The people Relator spoke with include:

- Physician tenants in Relator's medical office buildings, many of whom accept patients from large clinics, and many of whom compete with clinics;

- Relator's tenants' employees, especially older employees, who hear about healthcare marketing practices in Miami-Dade County, both directly and through their patients;

- Elderly visitors and other visitors to the shopping mall Relator owns, which is attached to Palmetto hospital;

- Elderly visitors and other visitors in the medical office buildings Relator owns and operates in Miami-Dade County;

- Relator's employees;

- Workers such as servers, bellhops, laborers in the communities where Relator owns and operates his businesses, including elderly workers;

14

⚹ Miami-Dade business owners, who are familiar with the healthcare needs of their employees and those employees' parents and grandparents and how to meet those needs.

47.  From this market research over many years, Relator learned that the clinics in Miami-Dade County (where Relator owns and operates medical office buildings), including those run by Defendants, offer and provide improper inducements to potential customers. Relator learned this happens with nearly all Hialeah-area clinics and especially with those run by the Defendant Clinics.  Relator also learned that the Government prohibits kickbacks and inducements to get federal healthcare business.

48.  More recently, Relator observed the Defendant Clinics' vehicles clogging his driveway to his medical office building and his shopping mall at Palmetto Hospital, where they typically carry two or fewer passengers. Not only did they block circulation of his tenants' customers and patients, they reduced parking revenue at his Palmetto Hospital garage.

49.  It became clear to Relator that the community's largest and most "successful" clinics, such as those owned and operated by Defendants, have become so by offering non-health related inducements to potential customers.

50.  It became clear to Relator that offers of free meals and free transportation that are not primarily health-related would and do influence Medicare beneficiaries to change providers and Medicare Advantage plans or to keep the providers and plans they have.

51.  Relator's conclusion concerning healthcare clinics was that although they are very, very profitable, their profitability is based in large part on their willingness to violate the Anti-Kickback Statute and the Anti-Inducement Statute so as to induce Medicare beneficiaries to use their clinics, to enroll in Defendants' Medicare Advantage plans and to stay enrolled in those plans.

15

52. Relator continues to be interested in owning and operating clinics, especially in Miami-Dade where he owns and operates medical office buildings.

**B. Defendants**

53. Defendant **HealthSpring, Inc.**, is a Delaware corporation based in a suburb of Nashville, Tennessee.

54. HealthSpring, Inc., is one of the largest managed-care organizations in the United States whose *exclusive* focus is on the Medicare market[10], and "whose primary focus is the Medicare Advantage market." Exhibit L, Fact Sheet for Investors.

55. Defendant **HealthSpring of Florida, Inc.** is a Florida corporation that does business as "Leon Medical Centers Health Plans" and was formerly known as Leon Medical Centers Health Plans, Inc. until it changed names in October 2007.

56. Defendants continue to use the former name, Leon Medical Centers Health Plans, Inc., for the Certification of Monthly Enrollment and Payment Data. Exhibit B, Claim-Request for Payment Certifications. *See*, Exhibit C, H5410 CMS agreement 2007 and the H2165 CMS 2009 agreement, Exhibit H, p. 20.

57. Defendant **Leon Medical Centers, Inc.** is a Florida corporation that operates medical clinics in Miami-Dade County, Florida and serves as a medical provider for the HealthSpring Defendants. Exhibit D, Medical Services Agreement- HealthSpring.

58. **Benjamin Leon, Jr.** is an individual resident of Florida, a Director of Defendant HealthSpring, Inc., Chairman of Defendant Leon Medical Centers, Inc., former President and CEO of Defendant Leon Medical Centers Health Plans (currently known as HealthSpring of

---

[10]    "We Are Who We Are  ...   Exclusive focus on the Medicare market . . ." at page 92, HealthSpring Investor Day 2010 report, March 26, The Intercontinental Barclay Hotel, New York, Exhibit G

Florida, Inc.). He devised the illegal inducement scheme at issue in this case and caused others to execute it.

59. The Leon Clinics provide medical services, supplies, prescription drugs and other services and supplies to patients with a variety of commercial and governmental healthcare benefits, but focus their business upon patients with Medicare benefits and especially Medicare Advantage plan benefits.

60. On information and belief **Leon Medical Centers, Inc.** has executed Medicare Enrollment Applications in the form attached as Exhibit C, pursuant to which they bill a fiscal intermediary of the Centers for Medicare and Medicaid Services ("CMS") charges under Medicare Part B on a fee-for-service basis.

61. **Leon Medical Centers, Inc.** and **Benjamin Leon, Jr.** are hereinafter collectively referred to as "**the Leon Clinics**," or simply, "**the Clinics." HealthSpring, Inc.**, and **HealthSpring of Florida, Inc.** are hereinafter collectively referred to as "**the HealthSpring Defendants**" or simply "**HealthSpring.**"

62. As of December 31, 2009, the HealthSpring Defendants were filing monthly claims with the United States for over 189,000 MA beneficiaries. Exhibit A, p. 44.

63. This Complaint concerns only Miami-Dade County Florida Medicare beneficiaries.

64. HealthSpring of Florida, Inc., formerly known as Leon Medical Centers Health Plans, Inc. sponsors plan H5410 which bills Medicare for coverage of over 18,000 Medicare beneficiaries in Miami-Dade County under Medicare Parts C and D.

### C. All Defendants

65. At all times relevant hereto, Defendants acted through their agents and employees and the acts of Defendants' agents and employees were within the scope of their agency and

17

employment. The offers and practices alleged in this complaint were, on information and belief, set or ratified at the highest corporate levels of the Leon Clinics and HealthSpring.

66.    The Leon Clinics act as a feeder system for enrollment of Medicare patients in the Medicare Advantage plans offered by HealthSpring.

67.    The Leon Clinics serve some Medicare beneficiaries under traditional Medicare Part B and use free meals, transportation and other inducements to lure additional Medicare Part B beneficiaries away from competing providers.

68.    For beneficiaries enrolled in traditional Medicare Part B, the Leon Clinics bill Medicare on a fee-for service basis.

69.     For beneficiaries enrolled in Medicare Advantage plans, the Leon Clinics receive a capitation payment from HealthSpring, a markup on the cost of prescription drugs dispensed to patients and a share of HealthSpring's profit or loss.

70.     The Leon Clinics therefore have an incentive to enroll and reenroll Medicare beneficiaries into HealthSpring's Medicare Advantage plans.

### III.  Statutory and Regulatory Programs Applicable to Defendants' FCA Violations

#### A.  Traditional Medicare (Parts A & B)

71.    Medicare is a federally funded health insurance program primarily benefiting the elderly. 42 U.S.C. § 1395 *et seq.*

72.    The United States Department of Health and Human Services (HHS), through its component CMS, administers the Medicare program.

73.    Medicare Part A is hospital insurance that covers the cost of inpatient hospital services and post-hospital nursing facility care. Provider charges under Medicare Part A are paid under a Prospective Payment System that provides a flat-rate payment based upon a patient's admitting

18

diagnostic code, with certain adjustments for outlier cases that greatly exceed average costs of treating patients with the same diagnosis.

74.     Medicare Part B is medical insurance that covers the cost of physician services and outpatient care. Provider charges under Medicare Part B are paid on a fee-for-service basis at rates established by Medicare.

### B.  Medicare Advantage (Parts C & D)

75.     Medicare Advantage ("MA") Plans (originally known as "Medicare+Choice Plans"), enacted at Medicare Part C, Social Security Act §1851 [42 U.S.C. § 1395w–21] through § 1859 [42 U.S.C. § 1395w–28] allow individuals to opt out of fee-for-service plans under Medicare Parts A and B and enroll in a privately run managed care plan.

76.     MA Plans are designed to provide all Medicare Part A and Part B benefits, plus additional *health-related* services, including subsidized prescription drug benefits under Medicare Part D for organizations electing to offer that benefit.

77.     The MA plans offered by HealthSpring in the Miami-Dade County market elect to provide the prescription-drug benefit.

78.     An MA plan provides health benefits coverage under a policy or contract offered by a Medicare Advantage organization under which a specific set of health benefits are offered at a uniform premium and uniform level of cost-sharing to all Medicare beneficiaries who reside in the service area of the MA plan and elect to join the plan.

79.     Unlike medical providers under Medicare Parts A and B, who submit claims on CMS forms 1450 and 1500 or their electronic equivalents, MA plans do not file invoice-type "claims" with CMS. Rather, MA plans, regulated under Medicare Part C, participate in a lengthy *payment process* in which MA plans, and MA plans' contractors and subcontractors, all provide data to the

19

government. Based on this data, an actuarial determination of annually re-determined capitation rates is calculated. 42 C.F.R. §422.308. The annual capitation rate is then paid to Medicare part C providers on a monthly basis. §422.306.

80.    HealthSpring described how it participates in this payment process (rather than fee-for-service based claims) in its Annual Report.

> CMS reimburses health plans participating in the Medicare Advantage program pursuant to a risk adjustment payment methodology based on various clinical and demographic factors, including hospital inpatient diagnoses, additional diagnosis data from hospital outpatient services and physician visits, gender, age, and eligibility status. All Medicare Advantage plans are required to capture, collect, and report the necessary diagnosis code information to CMS on a regular basis, which information is subject to review and audit for accuracy by CMS. The monthly premium varies based on the county in which the member resides, as adjusted to reflect the plan members' demographics and the members' risk scores.

Exhibit A, HealthSpring Annual Report p 3.

81.    As a condition to receipt of its monthly payment, the organization's chief executive officer (CEO), or an individual delegated with the authority to sign on behalf of the CEO, must make a monthly certification, based on best knowledge, information, and belief, that the risk adjustment data submitted to CMS are accurate, complete, and truthful. 42 C.F.R. § 422.502.

82.    The monthly certification requests payment as follows:

> " Pursuant to the contract(s) between the Centers for Medicare and Medicaid Services (CMS), and Leon Medical Centers Health Plans (hereafter referred to as "the Organization") governing the operation of the following contracts: H5410, the Organization hereby requests payment under the contract, and in doing so, makes the following certifications concerning CMS payments to the Organization . . ."
> [Emphasis supplied]

83.    Exhibit B shows four examples of these monthly claims for payment in claims titled "Certification of Monthly Enrollment and Payment Data":

20

- Ann Mary Pardo signing as Chief Financial Officer of "Leon Medical Centers Health Plans, Inc." requested payment on March 14, 2008 and again on August 5, 2008.[11]

- Ashok Sudarshon signing as "SVP – Business Systems" signed for plan H5410 "Leon Medical Centers Health Plans" [no "Inc."] on behalf of "HealthSpring, Inc" requested payment on February 5, 2010.

- Mercy Marill-Kirkpatrick signing as "Finance Director" signed for plan H5410 "Leon Medical Centers Health Plans" [no "Inc."] on behalf of "HealthSpring" [no "Inc."] and requested payment on July 7, 2010.

84. All the certifications state that they "request payment" under the contract. *Id.*

85. As required by the Government, nearly all data supporting these requests for payment is filed electronically.

### C. Current MA Plan Enrollees are Future Prospective Enrollees

86. Current enrollees in Medicare Advantage Plans are potential enrollees for the following plan year.[12]

87. For example, CMS defines "Promotional Activities," in relevant part, as "Activities performed by a plan, or by an individual or organization on a plan's behalf, to inform *current and*

---

[11]     As noted above, Leon Medical Centers Health Plans, Inc. filed a name change with the State of Florida effective October 1, 2007 and is now defendant **HealthSpring of Florida, Inc.**

[12]     Medicare regulations define the terms "enrollee," "plan enrollee," and "eligible individual":
    *"Enrollee* means an MA eligible individual who has elected an MA plan offered by an MA organization." 42 C.F.R. § 422.561 Definitions.
    "*MA eligible individual* means an individual who meets the requirements of Sec. 422.50." 42 C.F.R. § 422.2 Definitions.
    *"MA plan enrollee"* is an MA eligible individual who has elected an MA plan offered by an MA organization." 42 C.F.R. § 422.2 Definitions.

*potential enrollees* of the products available."  CMS Pub. 100-16 Medicare Managed Care, Chapter 3 Introduction 20 –  Definitions.

88.    Because current enrollees may leave a Medicare Advantage program from one year to the next, inducements such as free meals persuade current members to continue their enrollment from one year to the next.

89.    Nothing in the statute or regulations suggests a *current* enrollee with respect to one year's plan is not also a *prospective* or *potential* enrollee with respect to the following year's plan.

90.    Under MIPPA, the persons to whom meals may not be provided include "prospective enrollees," 42 U.S.C. § 1395w–21 (j)(1)(C), and "potential enrollees", 42 C.F.R. § 422.2268(p).

91.    MA Marketing Guidelines (CMS Pub. 100-16 Medicare Managed Care, Chapter 3) cover current enrollees who are viewed as potential enrollees.

92.    *Marketing* guidance for *current* enrollees is also extensively covered in the Medicare Marketing Manual, including definitions of "Post-Enrollment Marketing Materials," "Ad-hoc Enrollee Communications Materials" (which includes communications to current enrollees) and marketing guidance throughout the chapter.

93.    Other provisions in the Medicare Marketing Manual which govern marketing to current enrollees, and thereby view current enrollees as potential enrollees, include definitions of Ad-hoc Enrollee Communications Materials; 30.16, Plan Ratings Information, 40.11; 40.14.1 ("marketing materials sent to current members..."); 50.11; 60.4.2; 60.5.2; 60.7; 70.5; 70.5.1; 70.8 ("Marketing to current plan members of non-MA plan covered health care products, and/or non-health care products, is subject to HIPAA rules."); 70.11; 80.1; 80.1.3; 90.2.2; 90.10; 170.1; 170.2.

94. Consequently, under the prevailing rules and regulations, a current enrollee is a prospective enrollee.

95. As explained below, neither a current enrollee nor a prospective enrollee may be offered remuneration over a nominal amount as an inducement to enroll in a Medicare Advantage plan.

### D. Federal Anti-Kickback Statute

96. The Federal Anti-Kickback Statute (the "AKS"), Social Security Act 1128(B)(b), codified at 42 U.S.C. § 1320a-7b(b), establishes criminal penalties for:

> (b) Illegal remunerations
> ...
> (2) Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person—
> ...
> (B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program, ...

97. Under this statute, health care providers may not even *offer* any remuneration, directly or indirectly, overtly or covertly, that is intended to induce the purchase, order or recommendation of any service or item that may be paid for, in whole or part, by a federal health care program. 42 U.S.C. § 1320a-7b(b).

98. The AKS is violated if one purpose of an arrangement is to induce referrals, even if other, legitimate purposes are also present.

99. The provision of free goods or services to Medicare beneficiaries who have an ongoing relationship with a provider is likely to influence those beneficiaries to make future purchases or choose to remain with that provider.

23

100.    Compliance with the AKS is a material condition of payment under the Medicare program. 42 U.S.C. § 1320a-7b(g).

101.    A claim that includes items or services resulting from a violation of the AKS constitutes a false or fraudulent claim for purposes of the FCA. 42 U.S.C. § 1320a-7b(g).

102.    The "knowingly and willfully" standard of § 1320a-7b(b)(2) is met if Defendants knew their conduct was generally unlawful, regardless of whether they knew they were violating the AKS.

103.    The knowing submission of a claim based on a referral precluded by the AKS constitutes a violation of the False Claims Act.

104.    A provider who uses inducements such as free non-health related transportation and free meals has a competitive edge over other medical service providers and, thus, hurts the entire Medicare system by inducing individuals to make medical care choices based on factors extraneous to the provision of the best medical care and may further result in causing the failure of medical care providers who follow the laws and provide good services.

###    E.  The Anti-Inducement Statute

105.    The Anti-Inducement Statute, § 1128A(a)(5) of the Social Security Act [42 U.S.C. § 1320a–7a], authorizes the imposition of civil monetary penalties against health care providers that *offer* to or transfer remuneration to Medicare and Medicaid beneficiaries in order to influence their selection of a particular provider.

106.    The Anti-Inducement Statute defines "remuneration" to include transfers of items or services for free or for other than fair market value that a provider *knows or should know* is likely to influence such individual to order or to receive any item or service from a particular provider. 42 U.S.C. §1320a-7a(a)(5). *See also* 42 C.F.R. § 1003.102(b)(13).

24

107.     Free meals, non-health related transportation and entertainment of more than nominal value fall within the ambit of the Federal Anti-Inducement Statute.

108.    The "should know" standard is met if a provider acts with deliberate ignorance or reckless disregard. No proof of specific intent is required. *See* 42 C.F.R. § 1003.101.

109.    The OIG's Special Advisory Bulletin "Offering Gifts and Other Inducements to Beneficiaries," August 2002, put all MA providers on notice of the risks of providing valuable gifts and transportation.

110.    Defendants affirmatively acknowledged this prohibition by signing documents that were filed with the government.

111.    The Clinics, with the HealthSpring Defendants' knowledge and consent, provide free transportation, meals, and other gifts to current enrollees and free meals to current and prospective enrollees in violation of the Anti-Inducement Statute.

### F.  The False Claims Act

112.    Under the Federal False Claims Act (FCA), 31 U.S.C. §3729(a) *et seq*., any person having direct, personal knowledge about a violation of the Act may bring an action on behalf of the United States of America.

113.    A provider's failure to inform itself of the legal requirements for participation in the Medicare program acts in reckless disregard or deliberate ignorance of those requirements, either of which is sufficient to charge it with knowledge of the falsity of the claims under the FCA.

114.    Violations of the Anti-Kickback Statute and the Anti-Inducement Statute can form the basis for violations of the False Claims Act. Congress specifically amended the Anti-Kickback Statute on March 23, 2010, to clarify that "a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of [the FCA]."

25

Patient Protection and Affordable Care Act of 2010 ("PPACA"), Pub. L. No. 111-148 § 6402(f), 124 Stat. 119, 759 codified at 42 U.S.C. § 1320a-7b(g).

115.    Defendants violated the FCA in the particulars set forth below in Counts I through VIII of this complaint.

### G. Medicare Improvements for Patients and Providers Act of 2008 (MIPPA)

116.    Medicare Improvements for Patients and Providers Act of 2008 (MIPPA) established prohibitions and limitations for Medical Advantage (MA) plans and Medicare Prescription Drug plans (PDPs) on certain sales and marketing activities.

117.    MIPPA expanded the list of expressly prohibited marketing activities beginning in 2009 to include providing **meals**, gifts, marketing in health care settings or at educational events, etc. 42 U.S.C. § 1395w–21(j).

118.    MIPPA prohibits the offering of gifts to potential enrollees unless the gifts are of nominal value, and prohibits providing meals of any value to beneficiaries while conducting marketing activities. 42 U.S.C. § 1395w–21(j), *see* 42 C.F.R. § 422.2268 and for Prescription Drug Plan marketing, §423.2268(b).

### H. CMS Guidance on Meals and Transportation

119.    All MA plan benefits must be *health care* services. 42 C.F.R. § 422.2.

120.    Conversely, non healthcare services are not MA plan benefits.

#### *1. Guidance on Routine Transportation*

121.    Transportation benefits, other than *medically necessary transportation*, are expressly prohibited. For example, ambulance transportation in a medical emergency is medically necessary.

26

122. Free transportation services may implicate the criminal anti-kickback statute which prohibits offering anything of value to any "person" including a federal healthcare beneficiary to reward or induce referrals including self referrals for items or services reimbursable under any Federal health care program. OIG Advisory Opinion No. 07-02, issued March 7, 2007.

123. The Anti-Kickback Statute prohibits offers of free transportation services if one purpose of the offer is to induce self-referrals.

124. Since Miami-Dade Metro Transit offers free public transportation, other non emergency and non-ambulance plan provided transportation is not medically "necessary."

125. All of the defendants' facilities are on Miami-Dade bus routes. They are served by bus routes from one to six or more times per hour.

126. The Medicare Managed Care Manual at Chapter 4, § 30.4 reaffirms that *medically necessary* transportation does not encompass luxury transportation.

127. The OIG has determined that free transportation could generate prohibited remuneration under the Anti-Kickback Statute because it is likely to influence the initial or *subsequent* choice to obtain services and is likely to influence Medicare beneficiaries to choose one supplier over another. OIG Advisory Opinion No. 07-02, Issued March 7, 2007.

### *2. Guidance on Meals*

128. The CMS Managed Care Manual at Chapter 4 prohibits the offering of meals, because they are not primarily health related.

129. The Managed Care Manual clarifies that, with few exceptions, a current enrollee (who is also a potential enrollee for the following year) may <u>not</u> be provided meals. Managed Care Manual, Chapter 4, §30.5 – *Meals;* Chapter 3, Medicare Marketing Guidelines, 70.2.1 - Exclusion of Meals as a Nominal Gift.

27

130.   The Manual clarifies that meals are not permissible unless they are "<u>primarily</u> health

related." (Emphasis in original).

> While nutritional counseling is a desired aspect of case and/or disease
> management, the provision of "meals",  "meal vouchers" or grocery vouchers to
> individuals, without an underlying health care need, *cannot be classified as a
> health care benefit, because it is not primarily health-care related in nature.*
>          Therefore, to be classified as a benefit under the MA program the
> nutritional service *must be based on an underlying medical need*, or reason -
> consistent with the normal pattern of delivery of care for this illness, - that
> requires either home delivery of meals, a special diet, or special diet foods. For
> example, meals, immediately post-hospitalization for a specific limited number of
> days, to continue the required caloric or dietary needs of the patient, may be
> offered as a supplemental benefit.
>          *Social factors by themselves, such as limited income, or an inability to
> pick up meals cannot justify a classification of a nutritional service as an MA
> benefit.*
> [emphasis supplied] 20.24 - *Meals*  (Rev. 87; Issued: 06-08-07)

### IV.  Detailed Allegations

### A.  Offers of Valuable Meals and Transportation Violate the AKS and AIS

131.   The Anti-Kickback Statute prohibits even an ***offer*** of remuneration that is likely to

influence a choice of services.

### *1.  Relator's Knowledge of Transportation Violations*

132.   In August 2007, Relator became especially aware of the transportation provided by

Defendants since he was then evaluating the purchase of a medical office building and large

garage at Palmetto Hospital in Hialeah (Miami-Dade County), Florida.

133.   Following the purchases of the building and the garage, Relator, as the garage operator,

became increasingly aware of the frequency of free transportation stopping at his facility because

it erodes garage revenue.

134.   Although the vehicles can hold over a dozen passengers, they operate as private

limousines. Relator tracked Defendants' vehicles picking up and dropping off at his medical

28

office building in Hialeah, Florida. Of 185 trips, 101 trips – over half -- carried one or fewer (pickup only) passengers. Although the vehicles are capable of carrying over a dozen passengers, the most passengers ever observed was six seen in one trip (April 16, 2010, 8:14 a.m.), five on maybe two or three trips, four in maybe another two or three trips. Of the remaining nearly 180 out of 185 trips, Leon's vehicles carried two or fewer passengers. Exhibit J.

135.    Relator made inquiries and ad hoc observations of Defendants' vehicles going to Defendants' facilities and saw that most of the vehicles appeared to contain two or fewer passengers. He never saw a vehicle that appeared full. *Id.*

### *2.  Particulars of Offers*

136.    Defendants routinely offer free transportation services to current and prospective enrollees. Current and prospective enrollees are transported to medical facilities and other locations, including shopping malls, in luxury vehicles.

137.    The Leon Clinics promote transportation on their website[13]

At Leon Medical Centers we have a sizeable fleet of more than 70 buses that transport patients to and from any LMC service provider, including our Centers, as well as off-site healthcare providers. ....  **Color televisions and wide seating allow our patients to feel as comfortable as possible during their trip.  .**... Contact with the Welcome Center alerts employees that a patient is arriving at the hospital for a test or procedure and also allows the Welcome Center employee to request transportation when a patient is leaving the hospital so that the patient receives attention and guidance at all times. ...  **a patient can expect to be phoned by their personal driver prior to arrival.** When the driver reaches a patient's home, **they take them from their door to the bus,** helping them each step of the way.   ....
The forethought and prudence with which **Leon Medical Centers has developed its free and unlimited transportation services** affords patients with much needed access to care providing the best possible attention and the care necessary to keep them healthy.

---

[13]     Exhibit E, http://www.leonmedicalcenters.com/English/transportation.html (as of 9/10/10), same in

Spanish http://www.leonmedicalcenters.com/Spanish/transportation.html

[emphasis supplied]

138.    Relator personally observed breakfast being served at the Leon Clinics' Flagler facility and gathered substantial anecdotal reports of meals and food service throughout.

139.    At the Leon Medical Center located at 2020 W. 64th St. Hialeah, Fl, there is a facility similar to a restaurant with hostesses milling around trying to make people feel welcome and offering food. At this center, Greter Perez, Information Officer, told a potential enrollee to "eat as much as you want." They serve lunch, which included rice, beans, chicken, plantains, soft drinks and coffee on that day.

140.    In addition to many new buses, there was a tram in the parking lot for Medicare beneficiaries who arrive by car. There was a well-trained doorman greeting those arriving.

141.    On June 17, 2010, at about 2 p.m. the Leon Clinic located at the Mall of the Americas on Flagler and 79th Ave. was observed to have a cafeteria that serves snacks (pastelitos), and hot meals such as rice, beans, chicken, *ropa vieja* (shredded beef), Cuban coffee, and soft drinks. Everything is free for enrollees *and anyone they bring with them.*

142.    The Leon Medical Welcome Center at Hialeah Hospital offers hot meals. At lunch it serves chicken, beef, rice and beans, fried plantains, bread, soft drinks, Cuban coffee, and pastelitos.  Enrollees can spend the day at the "Wellness Center."

143.    The Leon Clinics provide transportation, not just for people going to see a doctor, but also for people who would just like to enjoy a free lunch or visit the Wellness Center.

144.     The Leon Clinics also serve breakfast -- scrambled eggs, bacon, potatoes, bread, butter, fruit juices, milk, and *cafe con leche*.

145.    Lunches are served in a box, not a buffet, and employees encourage people to bring food home with them if they would like.

30

146. There is no tracking of who is eating, no swiping of any ID card, and no record of who is eating. The Leon Clinics keep bringing more platters out throughout lunch, and croquetas, pastelitos, soft drinks and coffee are available all the time.

147. Leon Medical Center of Miami, located at 27th Ave SW 1st, has a cafeteria that provides coffee, pastries, soda etc. On May 5, 2010, the center's administrator, Isabel Sanchez, promoted enrollment by saying in the near future they would have a full service cafeteria.

148. On May 5, 2010 a Medicare beneficiary at the center said that the driver has taken him to Home-Depot and also to the supermarket.

### 3. General Allegations re Meals

149. The Leon Clinics offer free meals without regard to whether the person has a medical appointment or not.

150. The Leon Clinics offer free meals without regard to health or medical need.

151. The Leon Clinics offer free meals without regard to financial need.

152. The Leon Clinics offer free meals to Medicare beneficiaries who are not yet patients as well as offering free meals to current Medicare beneficiaries.

153. Although the value of meals provided varies with consumption and frequency of consumption, there are no limits placed on how many dishes or servings may be taken or the frequency with which patients, enrollees, potential patients and potential enrollees may take meals provided by the Clinics.

154. Thus, the offers for near daily meals and occasional weekend and holiday "party" meals are substantially in excess of $100 per year per enrollee.

31

155.   For the most part, the Leon Clinics do not track, document or otherwise record the identity of the Medicare beneficiaries who take meals or the value of what is provided to each Medicare beneficiary.

156.   The Leon Clinics' provision of meals is a factor that induces Medicare beneficiaries to patronize the Clinics and to enroll and remain enrolled in the HealthSpring Defendants' Medicare Advantage plans.

### *4. The Meals and Transportation are Valuable and Exceed "Nominal Value"*

157.   The transportation *offered* exceeds "nominal value" for all patients, potential patients, enrollees and potential enrollees.

158.   The transportation *provided* exceeds "nominal value" for patients, potential patients, enrollees and potential enrollees who make use of it.

159.   A portal-to-portal round-trip Miami-Dade county cab fare exceeds $10 for all trips exceeding one (1) mile and exceeds $15 for all trip exceeding 1.85 miles.

160.   A Miami-Dade county cab three-mile fare (assuming no additional $.40 per minute charge for wait time) is $9.30 ($10.70 with a 15% tip), a round trip fare of approximately $20.

161.   In contrast to typical Miami-Dade taxicabs, which would likely cost passengers going to Defendants' medical facilities in excess of the minimum allowed by law, Defendants provide transportation and limo-level service in vehicles that are often as well-appointed and as comfortable as typical Miami-Dade limousines.

162.   In 2006, the legal minimum rate for a limousine ride in Miami-Dade County was $80.

163.   Limousine companies that provide standup walk around vehicles similar to those provided by Defendants charge approximately $125 per hour or more, (before tax and tip), with a two or more hour minimum.

32

164. All the Leon Clinics offer free luxury transportation in which passengers can stand and walk.

165. The free transportation is in reality a *de facto* private limousine service.

### 5. *The Meals and Transportation Offered Is Not Need Based*

166. The Leon Clinics make available free transportation services to their enrollees without individualized determinations of need.

167. The Leon Clinics offer (and provide) free transportation to their medical and recreational facilities even if there is no medical purpose for the visit and the visits do not coincide with medical appointments.

168. The Leon Clinics' free transportation is provided to all, regardless of whether they have other regular and reliable means of transportation.

169. There exists abundant and economical public transportation in Miami-Dade County.

170. Public transportation in Miami-Dade County is *free* with a "Golden Passport," which is available upon proof of residency and age to all Miami-Dade residents age 65 and older, and Social Security beneficiaries.

171. All of the Leon Clinics' Miami-Dade facilities are served by Miami-Dade public transportation. Exhibit I.

172. The Leon Clinics transport patients and enrollees from their homes to Defendants' facilities and other locations, including shopping malls.

173. Defendants offer home to clinic round-trip transportation.

174. Defendants operate a fleet of over 100 vehicles in Miami-Dade County.

33

175.   Thus, the Leon Clinics transport potential patients and enrollees to their facilities, including many who seek transportation for the sole purpose of enjoying free meals and other non-health related social and entertainment activities offered by the Defendant Clinics.

176.   Other clinics that HealthSpring contracts with in other areas of the country do not offer free transportation.

### 6. Defendants Promote Meals and Transportation to Improve Sales

177.   "Improved retention" is HealthSpring's number one sales goal. Report to Investors.[14] HealthSpring's number one market, Florida, enjoys the highest retention rate, 91.4%, of all of the markets in which HealthSpring participates. *Id.*

178.   Retention is important because HealthSpring places a dollar value upon each of its enrollees and actually paid approximately $15,500 per South Florida enrollee in its acquisition of the Leon Medicare Advantage plan.[15]

179.   Since MIPPA restricts marketing practices and limits marketing commissions to under $403 per person,[16] the HealthSpring Defendants have an incentive to induce Medicare beneficiaries' enrollment and re-enrollment with luxury limousine-class transportation and meals and snacks.

---

[14]      Exhibit G, p. 30, Report, HealthSpring Investor Day 2010, March 26, The Intercontinental Barclay Hotel, New York.

[15]      Defendant HealthSpring paid Defendant Leon $400,000,000 ($355 million cash, plus $45 million stock) for Leon's 25,800 patients, approximately $15,500 per patient.

[16]      2011 Agent/Broker Compensation for Selling Health or Drug Plans. https://www.cms.gov/ManagedCareMarketing/08_AgentBroker.asp

34

180.    New member sales is also a high priority, and HealthSpring inducements pay off by

giving it the *highest* sales growth--12.5%, in the MA industry, 50% higher than number two,

Humana (9.5%). [17]

181.    HealthSpring covers over 197,436 Medicare Advantage enrollees as of June 30, 2010.

Exhibit K, HealthSpring Q2 2010- Investor Relations Press Releases.

182.    HealthSpring reports that Medicare beneficiaries enroll in HealthSpring in large part due

to ". . . additional benefits not offered through Medicare" page 17, HealthSpring Investor Day

2010, March 26, The Intercontinental Barclay Hotel, New York, Exhibit G. As discussed below,

the inducements <u>*not*</u> *offered through Medicare* are not health-related.

183.    Promotion is made in a large part through clinics' *offer* of free transportation and meals to

current and prospective enrollees.

184.    This promotion is described in part in the HealthSpring 2009 Annual Report, Exhibit A at

12:

>   <u>Sales and Marketing Programs</u>
>   In addition to traditional marketing methods including direct mail, radio,
>   television, internet and other mass media, and cooperative advertising with
>   participating hospitals and medical groups to generate leads, we also hold
>   educational meetings in churches and community centers and in coordination with
>   government agencies. We regularly participate in local community health fairs
>   and events, and seek to become involved with local senior citizen organizations to
>   promote our products and the benefits of preventive care.

---

[17]         HealthSpring (NYSE:HS), gross margin 21.1%, a sales growth of 12.5%; Humana
(NYSE:HUM) gross margin 20.7%, a sales growth of 9.5%; UnitedHealth (NYSE:UNH) gross
margin 23.7%, a sales growth of 7.4%; Centene (NYSE:CNC) gross margin 18.7%, a sales growth
of 3.6%; Prospect Medical Holdings (AMEX:PZZ) gross margin 23.2%, a sales growth of 2.3%;
Top 5 Companies in the Managed Health Care Industry, 10/21/10 http://www.mysmartrend.com/news-
briefs/news-watch/top-5-companies-managed-health-care-industry-highest-gross-margin-unh-pzz-hs-

185. For example, Defendant Benjamin Leon annually stars in one or more South Florida Super Bowl television ads. The ads typically show the Leon Clinics' buses and white-gloved doormen.

186. Leon Medical Centers Inc. has contracted with HealthSpring to provide advertising and promotion, excluding "sales, compliance, enrollment," which are performed by HealthSpring and its subsidiary corporations. Exhibit D, Medical Services Agreement, section 5, p. 12.

187. By contract, Leon's advertising budget is to increase from $3.8 million per year to $7 million per year during the course of the contract. Exhibit D, Medical Services Agreement, Section 5 "Advertising and Promotion Activities."

188. Leon and HealthSpring seek to induce member enrollment and retention by marketing, promoting and providing free transportation to their facilities and other destinations.

189. The Leon Clinics advertise and promote free transportation on their English and Spanish websites. Exhibit E.

190. The Leon Clinics advertise and promote themselves and their offers of free transportation on the vehicles themselves.

191. The bus ads are seen by hundreds of thousands of people per month in the communities in which the Leon Clinics operate.

192. All Defendants are aware of and approve of the provision of this free transportation.

193. On information and belief, the Leon Clinics fail to disclose to the Government that their transportation services and meals are offered:

�findicator without regard to medical necessity,

36

- without regard to whether the beneficiaries have medical appointments (i.e. the Leon Clinics provide free transportation for free lunch and other social and entertainment activities),

- in a manner that exceeds "nominal value,"

- without regard to availability of free public transportation and other alternative means of transportation,

- with little regard to location of pick-up or destination.

**B.  Defendants Conspired to Commit the Above Violations**

*1.  The Parties' Agreements*

194.    Defendants conspired and were complicit in the fraudulent scheme to get false or fraudulent claims paid.

195.    The HealthSpring Defendants enter into one or more agreements with the Leon Clinics. Exhibit D.

*2.  The Parties' Acts in Furtherance of their Conspiracy*

196.    The parties acted in furtherance of their conspiracy as detailed above.

*3.  The Parties' Intent to Defraud*

197.    The Parties' intent to defraud is detailed in section F below.

**C.  Defendants Acted Knowingly**

*1.  All Defendants Know of the Clinics' Offers of Meals and Transportation*

198.    All Defendants know or should know of the offers of meals and transportation because they are promoted by all Defendants. See, Exhibit L, Health Spring fact sheet touting transportation.

199.   All Defendants know or should know of the offers of meals and transportation because meals are served openly in the Leon Clinic facilities.

200.   All Defendants know or should know of the offers of meals and transportation because Defendants share top level officers and directors such as:

- Albert R Maury , CEO of HealthSpring of Florida, Inc. d/b/a "Leon Medical Centers Health Plans" and also a director of Defendant Leon Medical Centers, Inc.

- Defendant Benjamin Leon, Jr., a Director of Defendant HealthSpring, Inc., Chairman of Defendant Leon Medical Centers, Inc., former President and CEO of Defendant Leon Medical Centers Health Plans (currently known as HealthSpring of Florida, Inc.).

201.   Because the corporate entities share top level officers and directors, HealthSpring knows, or should know, of the offers of meals and transportation.

### 2.  *HealthSpring Knows the Defendant Clinics' Conduct Is Unlawful*

202.   The HealthSpring Defendants know, or had reason to know, their conduct was unlawful since HealthSpring's Principles of Business Ethics, Exhibit F states at p. 5: "Where any type of remuneration is offered or paid purposefully to induce or reward referrals of items or services payable by a federal healthcare program such as Medicare, the federal anti-kickback statute is violated."

203.   Defendants know free meals are prohibited because they are prohibited in the Managed Care Manual, Chapter 4, 20.24 - *Meals*  (Rev. 87; Issued: 06-08-07):

> [T]he provision of meals, meal vouchers or grocery vouchers to individuals, without an underlying need based on an actual illness, cannot be classified as a health care benefit, because it is not primarily health-care related in nature.
> ...
> Social factors by themselves cannot justify classification of a nutritional service as an MA benefit. Social factors include limited income, an inability to pick up meals, poverty, dual eligible status, poor diet – even if measured by recognized

survey instruments, or general statements by a provider that improved nutrition would result in better health status.

204. One purpose served by providing vehicles that seat 12 to 25 people is so Defendants can misrepresent to the Government that they provide mere "bus" service, thereby avoiding the label of prohibited *luxury* transportation.

205. One purpose of Defendants' provision of free transportation and meals is to induce patient patronage and member enrollment and reenrollment.

### *3. HealthSpring's Express Certifications Show Knowledge of Unlawful Conduct*

206. An organization must complete a *certified* Part C Medicare Advantage Application ("Application" or "Contract") to be accepted into the Medicare Advantage program. 42 C.F.R. § 422.501(b).

207. To qualify as an MA organization, enroll Medicare beneficiaries, and be paid on behalf of Medicare beneficiaries enrolled in the plan, an organization must enter into a contract with CMS. 42 C.F.R. § 422.503(a).

208. Mandatory contract provisions include a requirement that the organization "agrees to comply with (1) Federal laws and regulations," including applicable provisions "of the anti-kickback statute (section 1128B(b) of the Act)."

209. Medicare Advantage Plan regulations specifically name the AKS as a law "designed to prevent or ameliorate fraud, waste, and abuse." 42 C.F.R. § 422.504(h)[18]; § 423.505(h).

---

[18]     (h) *Requirements of other laws and regulations.* The MA organization agrees to comply with—

    (1) Federal laws and regulations designed to prevent or ameliorate fraud, waste, and abuse, including, but not limited to, applicable provisions of Federal criminal law, the False Claims Act (31 U.S.C. 3729 et. seq.), and the anti-kickback statute (section 1128B(b)) of the Act);

39

210.   HealthSpring and its subsidiary corporations entered into one or more such Contracts with the Government, including H5410 and others (the "Contracts").  Exhibits C and H.

211.   The Contracts between CMS and HealthSpring were renewed many times, including the H5410 contracts executed September 6, 2005 by Benjamin Leon as President/CEO of Leon Medical Centers Health Plans, Exhibit C, and December 9, 2009 by Michael Mirt, signing as HealthSpring's CEO, President and Chairman. Exhibit H, p. 20.

212.   The Contracts between the Centers for Medicare & Medicaid Services and the Leon defendants were renewed many times, including the contract executed September 6, 2005 by Benjamin Leon, signing as President and C.E.O. of Leon Medical Centers Healthplans. Exhibit C, p 19 (pdf p. 22)

213.   Managed Care organizations, such as HealthSpring, are required each month to "request payment under the contract" on a document in which they certify the accuracy, completeness, and truthfulness of certain data requested by HCFA "as a condition for receiving a monthly payment" of capitated fees. 42 C.F.R. § 422.502(l).

214.   As part of the certification, the organization must "certify that each enrollee for whom the organization is requesting payment is validly enrolled.  .  .  ." 42 C.F.R. § 422.502(l)(1).

215.   Defendants agreed to comply with the Anti-Kickback statute as a precondition of Medicare payment.

216.   As part of the Applications, Defendants made and regularly reaffirmed numerous express "attestations," including attestations that it would implement a Compliance Plan in accordance with the requirements of 42 C.F.R. § 422.503(b)(4).

40

217. The Compliance Plan sets forth HealthSpring's commitment to abide by all applicable Federal regulations, guidelines and standards – in addition to all state laws and regulations that federal law does not pre-empt.

218. HealthSpring agreed to comply with all CMS regulations and guidance, including but not limited to the Managed Care Manual, which contains additional prohibitions against improper gifts and inducements to beneficiaries.

219. HealthSpring agreed to comply with all CMS regulations and guidance pertaining to marketing, enrollment, disenrollment and eligibility including, but not limited to, the Managed Care Manual.

220. The Managed Care Manual referred to above explicitly requires that any promotional activities or items offered by Defendants, including those that will be used to encourage retention of members, must be of nominal value and must be tracked and documented during the contract year.

221. The Managed Care Manual's 2010 revisions prohibit Defendants from offering or giving remuneration to induce the referral of a Medicare beneficiary or to induce a person to purchase, or arrange for, or recommend the purchase or ordering of an item or service paid in whole or in part by the Medicare program.

222. In addition to express contractual certifications, an MA provider, while under contract, continues to make additional representations, including a monthly certification of contract compliance, as part of its request for payment.

223. The current monthly attestation includes, for example:

> I further attest that these benefits will be offered in accordance with all applicable Medicare program authorizing statutes and regulations and program guidance that CMS has issued to date and will issue during the remainder of 2009 and 2010,

41

including but not limited to, the 2010 Call Letter, the 2010 Solicitations for New Contract Applicants, the Medicare Prescription Drug Benefit Manual, the Medicare Managed Care Manual, and the CMS memoranda issued through the Health Plan Management System (HPMS).

224. The HealthSpring Defendants' contracts and the Managed Care Manual mandate that the HealthSpring Defendants monitor and ensure compliance with federal and state laws affecting the rights of enrollees including, but not limited to, federal laws and regulations designed to prevent or ameliorate fraud and waste, such as the False Claims Act and the Anti-Kickback statute. 42 C.F.R. § 422.504(h).

225. The HealthSpring Defendants' contracts and the Managed Care Manual mandate that Defendants adhere to CMS marketing provisions. 42 C.F.R. § 422.80(a), (b) and (c).

226. Truthfully attesting to compliance or future compliance with the applicable laws, statutes and guidelines contained in the "Part C Medicare Advantage Application" is a condition of participation in the MA program, which is necessarily a condition of payment by the government.

227. The HealthSpring Defendants received a capitation payment from CMS each month for each plan enrollee as a result of a monthly certification for payment.

228. In addition to the requirements at 42 C.F.R. § 422.502(l)(1), the Medicare Managed Care Manual, Chapter 11, § 130 (Certification of Data That Determine Payment Requirements) also requires MA organizations to attest each month that "each enrollee for whom the organization is requesting payment is validly enrolled in an MA plan offered by the organization." Medicare Managed Care Manual, Chapter 11, App. A (Certification of Monthly Enrollment and Payment Data Relating to CMS Payment to a Medicare Advantage Organization) (monthly certification).

42

#### *4. MIPPA's Prohibitions Made Defendants' Conduct Knowingly Unlawful*

229.   As described above, Defendants know, or have reason to know, their conduct is unlawful since the Medicare Improvements for Patients and Providers Act of 2008 (MIPPA) expanded the list of expressly prohibited marketing activities, beginning in 2009, to include providing **meals**, gifts, marketing in health care settings or at educational events, etc. 42 U.S.C. § 1395w–21(j).

230.   MIPPA prohibits the offering of gifts to potential enrollees unless the gifts are of nominal value, and prohibits providing meals of any value to beneficiaries while conducting marketing activities. 42 U.S.C. § 1395w–21(j), *see* 42 C.F.R. § 422.2268 and for Prescription Drug Plan marketing, §423.2268(b).

#### *5. The Managed Care Manual Informs Defendants of Their Unlawful Conduct*

231.   The definition of "marketing" includes "[s]teering, or attempting to steer, a potential enrollee towards a plan, or limited number of plans."  "Definitions," § 20 of the Marketing Guidelines.

232.   CMS's definition of marketing extends beyond printed materials to include *activities*, conducted by the plan sponsor or an individual or organization on behalf of the plan sponsor, *that steer or attempt to steer, a potential enrollee toward a plan*, or limited number of plans, for which the individual or entity performing marketing activities expects compensation directly or indirectly for such marketing activities.

233.   CMS's authority for marketing oversight encompasses various materials and activities.

234.   Direct or indirect marketing of HealthSpring's plans by the Leon Clinics and their providers is considered by CMS to be marketing by HealthSpring.

### _6.  The Anti-Inducement Statute Informs Defendants of Their Unlawful Conduct_

235.    Defendants know, or have reason to know, their conduct is unlawful since the Anti-Inducement Statute, § 1128A(a)(5) of the Social Security Act [42 U.S.C. § 1320a–7a], authorizes the imposition of civil monetary penalties against health care providers that _offer_ or transfer remuneration to Medicare and Medicaid beneficiaries in order to influence their selection of a particular provider.

236.    The Anti-Inducement Statute defines "remuneration" to include transfers of items or services for free or for other than fair market value that a provider _knows or should know_ is likely to influence such individual to order or to receive any item or service from a particular provider. 42 U.S.C. §1320a-7a(a)(5). _See also_ 42 C.F.R. § 1003.102(b)(13).

237.    The following activities fall within the ambit of the Federal Anti-Inducement Statute:

- Free transportation services
- Free meals, and also free snacks with an aggregate annual value in excess of a nominal amount

238.    The "should know" standard is met if a provider acts with deliberate ignorance or reckless disregard. No proof of specific intent is required. _See_ 42 C.F.R. § 1003.101.

### _7.  The OIG Informs Defendants of Their Unlawful Conduct_

239.    Defendants know their conduct is unlawful since the OIG's Special Advisory Bulletin "Offering Gifts and Other Inducements to Beneficiaries," August 2002, put all providers on notice of the risks of providing valuable gifts and transportation to current and prospective patients and enrollees.

44

240.    In the "Offering Gifts and Other Inducements to Beneficiaries" section, the OIG stated that it considers the provision of free goods or services to existing customers who have an ongoing relationship with a provider as likely to influence those customers' future purchases.

241.    Defendants know, or should know, their conduct is unlawful under HHS OIG Advisory Opinions No. 00-7, 09-01, and 11-02, which provide guidance on free transportation. The opinions put Defendants on notice that free transportation could generate prohibited remuneration under the Anti-Kickback Statute and the Anti-Inducement Statute where there is the requisite intent to induce referrals to a federally funded healthcare program, such as that provided by Defendants.

242.    Defendants know their conduct is unlawful since Defendants affirmatively acknowledged this prohibition by signing documents that were filed with the government, such as the monthly "Certification of Monthly Enrollment and Payment Data" signed by the HealthSpring Defendants.

## V.  Counts I to VIII

### Count I -- 31 U.S.C. §3729(a)(1)(A):  False or Fraudulent Claims Presented to Medicare Parts B, C, and D by the Clinics

Relator re-alleges and incorporates by reference the allegations in paragraphs 1- 242 above.

243.    This claim is for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729 et seq., against the Defendant Clinics.

244.    Through the acts described above, the Clinics knowingly presented: (1) directly to the fiscal agents of CMS false or fraudulent claims for payment or approval under Medicare Part B;

45

and (2) indirectly to CMS through the HealthSpring Defendants, as Medicare Advantage contractors, false or fraudulent claims for payment or approval under Medicare Parts C & D.

245.    All of the claims presented by the Clinics after October 28, 2000, were legally false or fraudulent because all such claims were tainted by the above-described violations of the Anti-Kickback Statute and the Anti-Inducement Statute.

246.    Federal law and the Defendant Clinics' Medicare Enrollment Applications on CMS Form 855 made compliance with these statutes a pre-condition to payment under Medicare Part B. The enrollment applications stated specifically that "I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with [Medicare] laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the supplier's compliance with all applicable conditions of participation in Medicare."

247.    Medicare regulations require that Medicare providers present claims for services rendered to beneficiaries under Medicare Part B on CMS Forms 1500 and/or UB 92 (CMS 1450) or their electronic equivalents. Exhibits F1 and F2. Also, the HealthSpring Medical Services Agreement applicable to services provided by the Leon Clinics under Medicare Parts C & D require submission of patient encounter reports setting forth the services furnished to patients, with all encounter data to be "coded to the highest level of specificity in accordance with CMS requirements," and, on information and belief, that data is submitted on CMS Form 1500 and/or UB 92 (CMS 1450).  See e.g., Exhibit D, HealthSpring Medical Services Agreement, p. 25, paragraph 8.5.

248.    The CMS 1500 form states that "NOTICE: Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information

46

may be guilty of a criminal act punishable under law and may be subject to civil penalties."
Exhibit F1. The UB 92 (CMS 1450) Form states "[s]ubmission of this claim constitutes
certification that the billing information as shown on the face hereof is true, accurate and
complete. That the submitter did not knowingly or recklessly disregard or misrepresent or
conceal material facts." Exhibit F2.

249.    Because violations of the Anti-Kickback Statute and the Anti-Inducement Statute are
material to Medicare's payment decision, failure to disclose violations of those statutes on CMS
Forms 1500, 1450 or their electronic equivalents renders such claims legally false or fraudulent.

250.    Because the Leon Clinics hold themselves out to the public in their marketing materials as
Medicare providers serving a population of senior citizens in the Miami-Dade County area, there
are reliable indications that numerous false or fraudulent claims on CMS Forms 1500, 1450 or
their electronic equivalents were in fact presented to fiscal agents of CMS by the Defendant
Clinics, either directly under Medicare Part D, or indirectly through the HealthSpring Defendants
under Medicare Parts C & D, after the Leon Clinics commenced violations of the Anti-Kickback
Statute and the Anti-Inducement Statute.

251.    As a result of the presentment of these false or fraudulent claims from and after October
28, 2000, the United States has been damaged and continues to be damaged in an amount yet to
be determined.

### Count II -- 31 U.S.C. §3729(a)(1)(B): False Statements Material to Claims Under Medicare Parts B, C, and D by the Clinics

Relator re-alleges and incorporates by reference the allegations in paragraphs 1- 242 above.

252.    This claim is for treble damages and penalties under the False Claims Act, 31 U.S.C. §
3729 et seq., against the Leon Clinics.

47

253.    Through the acts described above, the Leon Clinics knowingly made or used false statements material to claims presented: (1) directly to the fiscal agents of CMS under Medicare Part B; and (2) indirectly to CMS through the HealthSpring Defendants, as Medicare Advantage contractors, under Medicare Parts C & D.

254.    The Defendant Clinics' Medicare Enrollment Applications on CMS Form 855 contained false promises of compliance with the Anti-Kickback Statute and the Anti-Inducement Statute which the Leon Clinics had no intention of honoring. The enrollment applications stated specifically that "I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with [Medicare] laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the supplier's compliance with all applicable conditions of participation in Medicare." Exhibit F3 at 31.

255.    Medicare regulations require that Medicare providers present claims for services rendered to beneficiaries under Medicare Part B on CMS Forms 1500 and/or UB 92 (CMS 1450) or their electronic equivalents. Exhibits F1 and F2. Also, the HealthSpring Medical Services Agreement applicable to services provided by the Leon Clinics under Medicare Parts C & D require submission of patient encounter reports setting forth the services furnished to patients, with all encounter data to be "coded to the highest level of specificity in accordance with CMS requirements," and, on information and belief, that data is submitted on CMS Form 1500 and/or UB 92 (CMS 1450).  *See e.g.*, Exhibit D, HealthSpring Medical Services Agreement, p. 25, paragraph 8.5.

256.    The CMS 1500 form states that "NOTICE: Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information

48

may be guilty of a criminal act punishable under law and may be subject to civil penalties." The UB 92 (CMS 1450) Form states "[s]ubmission of this claim constitutes certification that the billing information as shown on the face hereof is true, accurate and complete. That the submitter did not knowingly or recklessly disregard or misrepresent or conceal material facts." Exhibit F2.

257.    Because violations of the Anti-Kickback Statute and the Anti-Inducement Statute are material to Medicare's payment decision, the Leon Clinics impliedly certified each time they presented a claim on CMS Forms 1500, 1450 or their electronic equivalents that they were in compliance with the Anti-Kickback Statute and the Anti-Inducement Statute.  All such certifications were false and constitute false statements material to false or fraudulent claims.

258.    Because the Clinics hold themselves out to the public in their marketing materials as Medicare providers serving a population of senior citizens in the Miami-Dade County area, there are reliable indications that numerous false or fraudulent claims on CMS Forms 1500, 1450 or their electronic equivalents were in fact presented to fiscal agents of CMS by the Defendant Clinics, either directly under Medicare Part D, or indirectly through the HealthSpring Defendants under Medicare Parts C & D, after the Leon Clinics commenced violations of the Anti-Kickback Statute and the Anti-Inducement Statute.

259.    As a result of these false statements and certifications from and after October 28, 2000, the United States has been damaged and continues to be damaged in an amount yet to be determined.

**Count III -- 31 U.S.C. §3729(a)(1)(A):  False or Fraudulent Claims Presented to Medicare Parts C and D by the HealthSpring Defendants**

Relator re-alleges and incorporates by reference the allegations in paragraphs 1- 242 above.

49

260. This claim is for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729 et seq. against the HealthSpring Defendants.

261. Through the acts described above, the HealthSpring Defendants knowingly presented to the fiscal agents of CMS false or fraudulent claims for payment or approval under Medicare Parts C & D.

262. All of the claims presented by the HealthSpring Defendants under Medicare Parts C & D after October 28, 2000, were legally false or fraudulent because all such claims were tainted by the above-described violations of the Anti-Kickback Statute and the Anti-Inducement Statute.

263. Federal law and the HealthSpring Defendants' Medicare Advantage Organization Contracts with Medicare on the Form attached as Exhibit H made compliance with these statutes a pre-condition to payment under Medicare Parts C & D. The contracts stated specifically, in Article IX (A), that "The MA Organization agrees to comply with . . . [f]ederal laws and regulations designed to prevent or ameliorate fraud, waste, and abuse, including, but not limited to . . . the anti-kickback statute . . . . "

264. The contracts further stated in Article V (A) and (C) that "Notwithstanding any relationship(s) that the MA Organization may have with related entities, contractors, or subcontractors, the MA Organization maintains full responsibility for adhering to and otherwise fully complying with all terms and conditions of its contract with CMS . . . . The MA Organization agrees that all contracts or written arrangements into which the MA Organization enters with providers, related entities, contractors, or subcontractors (first tier and downstream entities) shall contain the following elements: . . . . A provision requiring that any services or other activity performed by a related entity, contractor or subcontractor in accordance with a contract or written agreement between the related entity, contractor, or subcontractor and the MA

50

Organization will be consistent and comply with the MA Organization's contractual obligations to CMS.

265. Medicare regulations and the Medicare Advantage Organization Contract Form attached as Exhibit H require that the HealthSpring Defendants make monthly claims or requests for capitation payments on the form attached as B as to each beneficiary "validly enrolled." The contract states in Article IV (C) that "[a]s a condition for receiving a monthly payment under paragraph B of this article, and 42 CFR Part 422 Subpart G, the MA Organization agrees that its chief executive officer (CEO) . . . must request payment under the contract on the forms attached hereto . . . ."

266. Medicare regulations state that, as part of the certification, the organization must "certify that each enrollee for whom the organization is requesting payment is validly enrolled. . . ." 42 C.F.R. § 422.502(l)(1) (emphasis added). Any enrollee obtained via kickbacks and illegal inducements is not validly enrolled.

267. The HealthSpring Defendants did in fact make monthly claims for payment on the Certification of Monthly Enrollment and Payment Data form attached as Exhibit B, stating that "the Organization hereby requests payment under the contract, and in doing so, makes the following certifications concerning CMS payments to the Organization." The certification of enrollees implicitly included the certification required by 42 C.F.R. § 422.502(l)(1) that all such enrollees were "validly enrolled."

268. Because violations of the Anti-Kickback Statute and the Anti-Inducement Statute are material to Medicare's payment decision, failure to disclose on the claim form attached as Exhibit B that beneficiaries were not "validly enrolled" because they were obtained through violations of those statutes renders all such claims legally false or fraudulent.

51

269. CMS also requires the HealthSpring Defendants to submit, for purposes of calculating future-year capitation rates, cost data provided by the Leon Clinics on the CMS forms 1500 and 1450. Because accuracy of this data is vital to the integrity of the Medicare Advantage program, submission of tainted cost data inflated by violations of the Anti-Kickback Statute and the Anti-Inducement Statute is material to the Government's decision to pay the HealthSpring Defendant's capitation claims.

270. As a result of the HealthSpring Defendants' presentment of these false or fraudulent claims from and after October 28, 2000, the United States has been damaged and continues to be damaged in an amount yet to be determined.

**Count IV -- 31 U.S.C. §3729(a)(1)(B): False Statements Material to Claims Presented to Medicare Parts C and D by the HealthSpring Defendants**

Relator re-alleges and incorporates the allegations in paragraphs 1-242 as if fully set forth herein.

271. This claim is for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729 et seq. against the HealthSpring Defendants.

272. Through the acts described above, the HealthSpring Defendants knowingly made or used false statements material to claims presented to the fiscal agents of CMS under Medicare Parts C & D.

273. The HealthSpring Defendants' Medicare Advantage Organization Contracts with Medicare on the Form attached as Exhibit H contained false promises of compliance with the Anti-Kickback Statute and the Anti-Inducement Statute which the HealthSpring Defendants had no intention of honoring. The contracts stated specifically, in Article IX (A), that "The MA Organization agrees to comply with . . . [f]ederal laws and regulations designed to prevent or

52

ameliorate fraud, waste, and abuse, including, but not limited to . . . the anti-kickback statute . . . . "

274.    The contracts further stated in Article V (A) and (C) that "Notwithstanding any relationship(s) that the MA Organization may have with related entities, contractors, or subcontractors, the MA Organization maintains full responsibility for adhering to and otherwise fully complying with all terms and conditions of its contract with CMS . . . . The MA Organization agrees that all contracts or written arrangements into which the MA Organization enters with providers, related entities, contractors, or subcontractors (first tier and downstream entities) shall contain the following elements: . . . . A provision requiring that any services or other activity performed by a related entity, contractor or subcontractor in accordance with a contract or written agreement between the related entity, contractor, or subcontractor and the MA Organization will be consistent and comply with the MA Organization's contractual obligations to CMS.

275.    Medicare regulations and the Medicare Advantage Organization Contract Form attached as Exhibit H require that the HealthSpring Defendants make monthly claims or requests for capitation payments on the form attached as B as to each beneficiary "validly enrolled." The contract states in Article IV (C) that "[a]s a condition for receiving a monthly payment under paragraph B of this article, and 42 CFR Part 422 Subpart G, the MA Organization agrees that its chief executive officer (CEO) . . . must request payment under the contract on the forms attached hereto . . . ."

276.    Medicare regulations state that, as part of the certification, the organization must "certify that each enrollee for whom the organization is requesting payment is validly enrolled. . . ." 42

53

C.F.R. § 422.502(l)(1) (emphasis added). Any enrollee obtained via kickbacks and illegal inducements is not validly enrolled.

277. The HealthSpring Defendants did in fact make monthly claims for payment on the Certification of Monthly Enrollment and Payment Data form attached as Exhibit B, stating that "the Organization hereby requests payment under the contract, and in doing so, makes the following certifications concerning CMS payments to the Organization." The certification of enrollees implicitly included the certification required by 42 C.F.R. § 422.502(l)(1) that all such enrollees were "validly enrolled."

278. Because violations of the Anti-Kickback Statute and the Anti-Inducement Statute are material to Medicare's payment decision, the HealthSpring Defendants expressly or impliedly certified each time they presented a claim that they were in compliance with the Anti-Kickback Statute and the Anti-Inducement Statute. All such certifications were false and constitute false statements material to false or fraudulent claims.

279. CMS also requires the HealthSpring Defendants to submit, for purposes of calculating future-year capitation rates, cost data provided by the Leon Clinics on the CMS forms 1500 and 1450. Because accuracy of this data is vital to the integrity of the Medicare Advantage program, the HealthSpring Defendants impliedly certified that all sub-contractor claims data submitted to CMS was free from violations of the Anti-Kickback Statute and the Anti-Inducement Statute.

280. As a result of these false statements and certifications from and after October 28, 2000, the United States has been damaged and continues to be damaged in an amount yet to be determined.

**Count V -- 31 U.S.C. §3729(a)(1)(A): False or Fraudulent Claims the HealthSpring Defendants Caused the Leon Clinics to Present to Medicare Parts B, C, and D**

54

Relator re-alleges and incorporates the allegations in paragraphs 1-242 as if fully set forth herein.

281.    This claim is for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729 et seq. against the HealthSpring Defendants.

282.    By providing financial and marketing assistance to the Leon Clinics and otherwise aiding and abetting the clinics' inducement of potential patients to choose the clinics as their health care providers, knowing and foreseeing that the Leon Clinics would present claims tainted by violations of the Anti-Kickback Statute and the Anti-Inducement Statute as set forth in Count I above, the HealthSpring Defendants caused the Leon Clinics to present false or fraudulent claims to Medicare Parts B, C and D.

283.    As a result of the presentment of these false or fraudulent claims, from and after October 28, 2000 to the present, the United States has been damaged and continues to be damaged in an amount yet to be determined.

### Count VI -- 31 U.S.C. §3729(a)(1)(A):  False or Fraudulent Claims the Leon Clinics Caused the HealthSpring Defendants to Present to Medicare Parts C and D

Relator re-alleges and incorporates the allegations in paragraphs 1-242 as if fully set forth herein.

284.    This claim is for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729 et seq. against the Defendant Clinics.

285.    By providing financial and marketing assistance to the HealthSpring Defendants and otherwise aiding and abetting the HealthSpring Defendants' inducement of potential enrollees to choose HealthSpring Medicare Advantage plans, knowing and foreseeing that the HealthSpring Defendants would present capitation claims for enrollees obtained through violations of the Anti-Kickback Statute and the Anti-Inducement Statute as set forth in Count III above, the Leon Clinics caused the HealthSpring Defendants to present false or fraudulent claims to Medicare

55

Parts C and D.

286.    Also, by submitting fee-for-service claims tainted by violations of the Anti-Kickback Statute and the Anti-Inducement Statute to the HealthSpring Defendants as contractors of CMS, knowing and foreseeing that the HealthSpring Defendants would present tainted capitation claims for the current year and tainted cost data to CMS for purposes of calculating future-year capitation rates, the Leon Clinics caused the HealthSpring Defendants to submit false or fraudulent claims to Medicare Parts C & D.

287.    As a result of the presentment of these false or fraudulent claims from and after October 28, 2000, to the present the United States has been damaged and continues to be damaged in an amount yet to be determined.

### Count VII -- 31 U.S.C. §3729(a)(1)(C):  False Claims Act Violations of Benjamin Leon, Jr.

Relator re-alleges and incorporates the allegations in paragraphs 1-242 as if fully set forth herein.

288.    This claim is for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729 et seq. against Benjamin Leon, Jr.

289.    Benjamin Leon, Jr., as the founder of the Leon Clinics and the Medicare Advantage plan now operated by the HealthSpring Defendants, devised the illegal patient inducement scheme at issue in this case and knowingly caused its execution.

290.    He is therefore liable both as a principal wrongdoer and secondarily for causing the Leon Clinics and the HealthSpring Defendants to present claims to the United States in violation of the Anti-Kickback Statute, the Anti-Inducement Statute and the False Claims Act as set forth in the preceding counts of this Complaint.

56

291. The United States has been damaged and continues to be damaged in an amount yet to be determined.

### Count VIII -- 31 U.S.C. §3729(a)(1)(C):  False Claims Act Violations for Conspiracy

Relator re-alleges and incorporates the allegations in paragraphs 1- 316 as if fully set forth herein.

292. This claim is for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729 et seq. against all Defendants.

293. The HealthSpring Defendants conspired with the Leon Clinics to commit violations of the False Claims Act by presenting claims tainted by illegal inducements offered to Medicare patients in violation of the Anti-Kickback Statute and the Anti-Inducement Statute.

294. All Defendants performed acts in furtherance of the conspiracy or conspiracies as set forth above.

295. All Defendants had the requisite intent to defraud.

296. The United States has been damaged and continues to be damaged in an amount yet to be determined.

### Prayer for Relief

297. Relator respectfully requests this Court to enter judgment against all Defendants, as follows:

(a)    That the United States be awarded damages in the amount of three times the damages sustained by the United States because of the false or fraudulent claims alleged within this Complaint, as the Civil False Claims Act, 31 U.S.C. §§ 3729 *et seq.* provides;

(b)    That civil penalties of $11,000 be imposed for each and every false claim that the Defendants presented to the United States;

57

(c)     That pre- and post-judgment interest be awarded, along with reasonable attorneys' fees, costs, and expenses which the Relator necessarily incurred in bringing and pressing this case;

(d)     That the Court grant permanent injunctive relief to prevent any recurrence of violations of the False Claims Act for which redress is sought in this Complaint;

(e)     That the Relator be awarded the maximum percentage of any recovery allowed to him pursuant the False Claims Act, 31 U.S.C. §3730(d)(1),(2);

(f)     That this Court award such other and further relief as it deems proper

298.    Relator hereby demands a trial by jury.


Respectfully Submitted,


 /s/ Michael Hamilton_____
Michael Hamilton
Tennessee Bar 10720
Provost & Umphrey, LLP
2021 Richard Jones Rd., Suite 300
Nashville, Tennessee 37215
(615) 242-0199
(615) 256-5922 (fax)
mhamilton@pulf.com

Jonathan Kroner*
Florida Bar 328677
Jonathan Kroner Law Office
420 Lincoln Rd., Suite 248
Miami Beach, FL 33139
(305)310.6046
JK@FloridaFalseClaim.com

Charles S. Siegel*
Texas Bar 18341875
Loren Jacobson*

58

Texas Bar 24050813
Waters & Kraus, LLP
3219 McKinney Avenue
Dallas, Texas 75204
(214) 357-6244
(214) 357-7252 (fax)
siegel@waterskraus.com
ljacobson@waterskraus.com

Wm. Paul Lawrence, II*
Texas Bar 24004130
Waters & Kraus, LLP
37163 Mountville Rd.
Middleburg, VA 20117
(540) 687-6999
(540) 687-5457 (fax)
plawrence@waterskraus.com

Dan Hargrove*
Texas Bar 00790822
Waters & Kraus, LLP
600 Navarro St., #500
San Antonio, TX 78205
(210) 349-0515
(210) 349-3666 (fax)
dhargrove@waterskraus.com

Jennifer L. McIntosh*
California Bar 264903
Waters Kraus & Paul
711 Van Ness Ave., Suite 220
San Francisco, CA 94102
(415) 296-6060
(214) 777-0489 (fax)
jmcintosh@waterskraus.com

*Pro Hac Vice Applications to be Submitted*

Attorneys for Plaintiff-Relator

**Exhibit List**

Ex A HealthSpring 2009 Annual Report Excerpt

Ex B Claim-Request for Payment Certifications

Ex C H5410 Agreement from HealthSpring 10K 2007

Ex D Medical Services Agreement from HealthSpring 8K October 2007

Ex E Leon Medical Centers Transportation Services from Website

Ex F HealthSpring Ethics Code Excerpt

Ex F1 Claim Form CMS 1500

Ex F2 Claim Form CMS 1450 (UB 92)

Ex F3 CMS Form 855b-Clinic Enrollment

Ex G HealthSpring Investor Meeting March 2010

Ex H HealthSpring, Inc. 10-K February 11, 2010

Ex I Bus Routes

Ex J Sample Leon Bus Service to Relator's Medical Building at Palmetto Hospital

Ex K HealthSpring Q2 2010-Investor Relations Press Release Med Loss Ratio

Ex L HealthSpring Fact Sheet Touting Transportation

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been served on counsel of record via the

Court's CM/ECF system on this 14th day of February, 2012.

Wallace Dietz
Brian Roark
Sarah Bogni
Bass Berry & Sims, PLC
150 Third Ave. South, Suite 2800
Nashville, TN  37201-3001

Ellen Bowden McIntyre
Assistant United States Attorney
110 9th Avenue South, Suite A-961
Nashville, TN  37203

/s/ Michael Hamilton____

Michael Hamilton
PROVOST & UMPHREY, LLP
mhamilton@pulf.com
2021 Richard Jones Rd., Suite 300
Nashville, TN 37215
Telephone: (615) 242-0199
Fax: (615) 256-5922