UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.*, MARC OSHEROFF, | )<br>)<br>) |
| Plaintiff, | )<br>) |
| v. | ) No. 3:10-1015<br>) Judge Sharp |
| HEALTHSPRING, INC.,<br>HEALTHSPRING OF FLORIDA, INC.,<br>LEON MEDICAL CENTERS, INC.,<br>BENJAMIN LEON, JR., | )<br>)<br>)<br>)<br>) |
| Defendants. | ) |

## MEMORANDUM

This *qui tam* action brought by Relator Marc Osheroff attacks certain inducements offered by medical clinics to Medicare beneficiaries in the Miami area. Defendants HealthSpring, Inc., HealthSpring of Florida, Inc., Leon Medical Centers, Inc., and Benjamin Leon, Jr., have filed Motions to Dismiss (Docket Nos. 56 & 57). Those Motions have been fully briefed by the parties, and the Court heard oral argument on the motions on March 12, 2013. For the reasons that follow, the Motions to Dismiss will be granted.[1]

### I. BACKGROUND

To place the legal issues presented to the Court in context, the Court begins by setting forth

---

[1] The HealthSpring Defendants also filed a "Motion to Strike Declaration of Jonathan Kroner" (Docket No. 76), in which the other Defendants joined. That Declaration, filed by counsel for Relator, merely states that counsel "voluntarily provided to the Government a written summary of all known material evidence and information related to the Complaint, including the 'independent, materially additional information' upon which Relator relies for his original source status, on September 24, 2010, before filing the Relator's complaint." (Docket No. 74 at 2). Because this assertion does not alter this Court's opinion that dismissal is warranted, the Motion to Strike will be denied.

1

the pertinent factual allegations from the controlling complaint. The Court will then discuss another lawsuit filed by Relator, as well as media accounts that appeared in the Miami media relating to the amenities provided by South Florida medical centers.

**A.**

The relevant facts, drawn from the First Amended Complaint (Docket No. 25), and accepted as true for present purposes, are as follows:

Relator is a resident of Broward County and works there and in Broward and Miami-Dade County as well. Defendant HealthSpring, Inc. is one of the largest managed-care organizations in the United States, and is focused on the Medicare market, and more specifically, the Medicare Advantage market.[2] Defendant HealthSpring of Florida does business as "Leon Medical Centers Health Plans." Defendant Leon Medical Centers, Inc. operates medical clinics in Miami-Dade County, and is a medical provider for the HealthSpring Defendants. Defendant Benjamin Leon, Jr. a Director of Healthspring Inc. and Chairman of the Leon Medical Centers, is allegedly responsible for devising the "scheme" at issue in this case.

Relator is an "entrepreneur" who has operated numerous successful businesses in varied fields, ranging from electronics, to motorcycles, to commercial real estate, to medical office buildings. High school educated, and having completed no business or marketing courses, Relator relies upon "informal marketing research" to determine whether a business venture should be

---

[2] Medicare has several component parts: Medicare Part A is hospital insurance, covering inpatient hospital services and post-hospital nursing facility care, and is generally paid on a flat-fee basis; Medicare Part B is medical insurance, covering the costs of physician services and outpatient care, also generally paid on a fee-for-service basis; Medicare Advantage (formerly known as Medicare + Choice) is a plan offered by private companies that contract with Medicare to provide Part A and B benefits, for which Medicare pays a fixed amount per patient per month for care. Medicare Advantage programs also sometimes cover prescription drug benefits under Medicare Part D.

explored.

Since 1993, Relator has owned a commercial building, and his tenants have included physicians. He understands medical clinics to be very profitable, and has some experience in the medical clinic field, having founded the Centre of Cosmetic Surgery with a physician partner in 1996.

Sometime in the early 2000s, Relator, along with a physician partner, began to investigate opening an outpatient surgery and rehabilitation center in a medical office building he owned on the campus of what is now called the Jackson North Medical Center. Researching the potential, Relator discovered "that the competition for patients faced barriers created by Defendants' clinics and others, who compete for patients using unlawful inducements," and that "[o]nce these clinics 'owned' the patients by virtue of continued inducements, the patients were removed from the market." (Id. ¶ 42). Relator decided to abandon this business venture.

In 2006, again with a physician partner, Relator began to develop plans for an MRI (magnetic resonance imaging) clinic, having already expended money in MRI hardware and outfitting a facility with high amperage electricity, extra air conditioning, and copper lining in the wall. Relator again researched the market, but backed out because [o]nce Leon 'owned' the patients by virtue of continued inducements, those patients were removed from the market," and "Defendants (and others) could then choose whether to install their own MRI hardware or negotiate a much less profitable arrangement with an office such as Relator's." (Id. ¶ 44).

Relator's "research" into the medical clinic field was based primarily upon his talking with people. Specifically, he claims to have spoken to "many people" and "ask[ed] many questions." (Id. ¶ 35). Those "people" included Relator's tenants (including physician tenants) and their

3

employees, visitors (including the elderly) who shop at a mall owned by Relator and attached to Palmetto Hospital, his own employees, Miami-Dade business owners, and workers "such as servers, bellhops [and] laborers in the communities where Relator owns and operates his businesses, including elderly workers[.]"[3] (Id. ¶ 46).

According to Relator, his "research" and some personal observations show that the inducements offered by Defendants "go far beyond gifts of nominal value." (Id. ¶ 13). The Leon Clinics are actively marketed as "social centers to which senior and underprivileged patients are chauffeured in free limousine-class vehicles to enjoy free meals, take-away food, personal pampering, bingo, dominoes, raffles, music and dance as part of an expense-free social or entertainment outing of great cost to the clinics and significant value to their patrons." (Id.). Happy with those perks, Medicare recipients are "induced" to "patronize the Leon Clinics and enroll in the HealthSpring Medicare Advantage plans at the expense of federal healthcare programs." (Id. at 12). Moreover, although Medicare recipients can leave a specific provider's plan, the offering of the perks makes it more likely that they will remain in HealthSpring's Medicare Advantage plan, year after year.

The inducements about which Relator primarily complain include free transportation and free meals by Leon Medical Clinics. Both are allegedly provided to HealthSpring plan participants without any individualized determination of need.

The applicable regulations allow for medically necessary transportation. All of the Leon Medical Clinics are on bus routes, and Miami Dade Transit offers free public transportation on buses

---

[3] At oral argument, the Court was informed that Relator's research was also informed by the work of an investigator that Relator, or more accurately counsel for Relator, hired.

that pass each Leon facility on at least an hourly basis. Nevertheless, free "luxury rides" are provided to the clinics, even if there is no medical purpose for the visit, or the visit does not coincide with a medical appoint. The clinics also offer "luxury rides" to other locations as well, including shopping malls.[4]

The vehicles utilized by the clinics "can hold over a dozen passengers," and "operate as private limousines." (Id. ¶ 134). The vast majority of the time, however, the vehicles transport far fewer than twelve individuals, and most often only one or two passengers. Relator became acutely aware of this after he found the clinics' vehicles "clogging his driveway to his medical office building and his shopping mall" in Palmetto. (Id. ¶ 48).

At some point, "Relator tracked Defendants' vehicles picking up and dropping off at his medical office building in Hialeah, Florida," and found that in "nearly 180 out of 185 trips, Leon's vehicles carried two or fewer passengers." (Id. ¶ 134). For the other five or so trips, Relator's "tracking" found six passengers on one occasion, five passengers on two or three occasions, and four passengers on two or three occasions. (Id.).

Free transportation is touted on the clinics' website. Both the English and Spanish language versions contain the following description of the services provided:

> At Leon Medical Centers we have a sizeable fleet of more than 70 buses that transport patients to and from any LMC service provider, including our Centers, as well as off-site healthcare providers. . . . Color televisions and wide seating allow our patients to feel as comfortable as possible during their trip.
>
> \*         \*         \*
>
> . . . Contact with the Welcome Center alerts employees that a patient is arriving at the hospital for a test or procedure and also allows the Welcome Center employee

---

[4] For example, one Medicare beneficiary stated that a Leon Medical Center vehicle "has taken him to Home-Depot and also to the supermarket." (Id. ¶ 148).

5

> to request transportation when a patient is leaving the hospital so that the patient receives attention and guidance at all times. . . .
>
> . . . [A] patient can expect to be phoned by their personal driver prior to arrival. When the driver reaches a patient's home, they take them from their door to the bus, helping them each step of the way. . . .
>
> The forethought and prudence with which Leon Medical Centers has developed its free and unlimited transportation services affords patients with much needed access to care providing the best possible attention and the care necessary to keep them healthy.

(Id. ¶ 137).

In addition to free transportation that allegedly violates the applicable regulations, Relator maintains that the Leon Medical Clinics provide free food that goes far beyond a "nutritional service based upon an underlying medical need," authorized by Medicare provisions. Free meals are offered "without regard to health or medical need" and "without regard to financial need," and are provided to Medical beneficiaries whether they are patients or not. (Id. ¶¶ 150-152). No limit "is placed on how many dishes or servings may be taken or the frequency with which patients, enrollees, potential patients and potential enrollees may take meals provided by the clinics." (Id. ¶ 153). Nor is an effort marked to track those who are eating, and there is no swiping of an ID card which might show who is eating what. In fact, "employees encourage people to [take] food home with them if they would like." (Id. ¶ 145).

The meals and the facilities in which they are served vary, but are far from mundane. Examples from Relator's "research" include:

> The Leon Medical Center in Hialeah contains a facility "similar to a restaurant with hostesses milling around trying to make people feel welcome and offering food," and a "well-trained doorman greet[s] those arriving.[5] Visitors are told to "eat as much as you want," and on one occasion, the lunch menu consisted of "rice, beans, chicken,

---

[5] For those arriving by car instead of a clinic vehicle, a tram shuttles patients to the door.

plantains, soft drinks and coffee[.]"

The Leon Medical Welcome Center at Hialeah, where "[e]nrollees can spend the day at the 'Wellness Center,'" offers hot meals and "serves chicken, beef, rice and beans, fried plantains, bread, soft drinks, Cuban coffee and pastelios."

The Leon Clinic at the Mall of Americas in Miami has a cafeteria that serves both snacks, and hot meals. On June 17, 2010 the lunch menu was "rice, beans, chicken, ropa vieja (shredded beef), Cuban coffee, and soft drinks. Snacks and lunch were "free for the enrollee and anyone they bring with them."

(Id. ¶¶ 139-142).

The free food provided is not limited to snacks and lunches, as the Leon Clinics also serve free breakfast. The breakfast menus consist of "scrambled eggs, bacon, potatoes, bread, butter, fruit juices, milk, and café con leche." (Id. ¶ 144).

Relator contends that the inducements in the form of free food and rides violate the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, which makes it a crime to even offer illegal remuneration, and the civil Anti-Inducement Act, 42 U.S.C. § 1370a-7a, which prohibits offering remuneration that is likely to influence a Medicare recipient to utilize a specific provider. Violation of those provisions, in turn, serves a the basis for claims under the False Claims Act, 31 U.S.C. §§ 3729, *et seq*.

On October 28, 2010, Relator filed a sealed *qui tam* Complaint in this Court. On November 10, 2011, the United States and the State of Tennessee declined to intervene in the matter, and the Complaint was subsequently unsealed. On February 14, 2012, Relator filed a First Amended Complaint. That Complaint is in eight counts and alleges that all of the defendants, individually and as part of a conspiracy, submitted false statements or claims, and/or made false representations in order to secure Medicare payments.

**B.**

This is not the only *qui tam* action Relator has filed complaining about services provided to Medicare beneficiaries by medical clinics in South Florida. In <u>United States *ex. rel.* Osheroff v. Humana, Inc.</u>, 2012 WL 4479072 (S.D. Fla. Sept. 28, 2012), which noted the existence of yet another Medicare *qui tam* action by Relator styled <u>United States *ex rel.* Osheroff v. Tenet Healthcare Corp.</u>, No. 1:09-22253-cv-HUCK (S.D. Fla. 2009), Relator sued "owners and operators of 'Cuban-style medical clinics'[6] in Miami Dade County," along with several health insurance companies that provided Medicare Advantage plans to the clinics' patients. <u>Humana, Inc.</u>, 2012 WL 4479072 at *1. Based upon Relator's "investigation," he discovered that the clinics provided free transportation and food, among other things[7]:

> Specifically, Relator allege[d] that the services offered by the Clinics and promoted by the Humana Defendants are offered without regard to their patients' medical or financial needs, without regard to whether they have medical appointments, and in a manner that exceeds "nominal value." For example, Relator claim[ed] that the Clinics' "free unlimited transportation" services are in fact "limousine-class" services that have been used to shuttle patients to malls, casinos, and other "field trips" unrelated to medical appointments, and to pick up patients from locations as far away as the Florida Keys. Regarding the Clinics' free daily meals, Relator claims that they are available at any time, even to go, and even when patients are not scheduled to see a physician. Lastly, he maintain[ed] that the Clinics' free massages and salon services (e.g., haircuts, pedicures, and manicures) are similarly unrelated to the medical needs of their patients.

<u>Id</u>. at *3.

The court in <u>Humana, Inc.</u> granted Defendants' motions to dismiss and dismissed the action with prejudice. In doing so, the court found that Relator's complaint was based upon publically

---

[6] "The distinguishing feature" of "Cuban-style" medical clinics is "that they offer 'wellness' programs and social activities in addition to standard primary and specialty medical care." <u>Humana, Inc.</u>, 2012 WL 4479071 at *1.

[7] In addition to free food and rides, Relator alleged that the clinics provided massages, salon services and entertainment.

8

disclosed matters, and that Relator was not an original source for purposes of the False Claims Act. Relator's subsequent motion for reconsideration was denied. United States ex rel. Osheroff v. Humana, Inc., 2013 WL 39877 (S.D. Fla. Jan. 31, 2013).

## C.

Among the public disclosure mentioned in Humana, Inc., was a series of articles published in the "Business Monday" section of the *Miami Herald*. On March 12, 2007, Business Monday ran a feature article titled "Upbeat Checkups," with the sub-heading, "Cuban-style clinics are a big hit in South Florida. Could they become America's healthcare model for the future?" (Docket No. 58-1 at 1). Featured prominently in the article were the Leon Medical Centers,[8] and, in fact, the lead sentence stated: "At the new Leon Medical Center in Hialeah, a white-gloved and uniformed doorman welcomes seniors in front of bubbling waterfalls." (Id. at 4). The article then continued:

> Inside, along with marbled restrooms, seniors get free dental and vision care – care that regular Medicare recipients must pay for themselves.
>
> In Westchester, at a CAC Florida clinic, seniors are participating in free exercise classes, playing dominoes and competing in bingo tournaments, as well as getting free coffee and breakfast pastries.
>
> In both places, everything is paid for by taxpayer dollars.

(Id). The article goes on to state that "the average senior in Miami costs Medicare about twice as much per year as a senior in Minneapolis" and "with an additional $5,600 to spend on each senior" yearly, clinics in South Florida "can lavish extra benefits on them." (Id. at 7).

The next article in the same Monday Business section was titled, "Leon, CAC patients get Ritz-Carlton treatment." (Docket No. 58-2 at 3). The article began with the observation that

---

[8] In an inset, it was noted that Leon Medical Centers were founded in 1996, and there were five Leon clinics in the Miami-Dade that serviced 25,000 patients, "all belonging to Leon's own Medicare HMO." (Id. at 5).

9

patients are greeted at the door by a "cheerful woman," and provided "cafecitos and snacks" in the clinics' waiting rooms. (Id.). The article also revealed that "[w]ell over half of CAC and Leon clients arrive by van – at no charge." (Id.). One patient, who has visited CAC and Leon clinics for 25 years, was quoted as saying that Leon has "the very best van drivers." (Id.). The article then stated that "[t]o make sure all employees understand the concept of service, Leon puts everyone through a Ritz-Carlton training program on how to treat customers," because, according to Mr. Leon, "[e]veryone to us is a billionaire." (Id.).

The same day as the "Upbeat Checkups" articles, the *Miami Herald* ran an editorial relating to those articles. In it, the author, Terence Shepherd, lamented the fact that his parents had moved from South Florida to Tarrant County, Texas where the Medicare rate for beneficiaries is a "miserly $801.22" compared to the $1,198 in Miami-Dade. He opined that "[i]f everyone had access to a waiting room that could double as a rec room or spa, a place where everybody knows your name and there's a primary physician to keep you ticking, we'd all be better off." Noting that the "rate is higher here because healthcare costs more here" and the cost of living is higher, Mr. Shepherd also opined that higher costs were attributable to "massive amount of fraud, which totals about $1 billion a year." (Docket No. 48-4).

Other articles about the lavishness of medical clinics in South Florida also ran in the *Miami Herald*. An August 11, 2007, article stated that HealthSpring "was paying a premium to enter the lucrative reimbursement market" and that the $400 million price to acquire Leon Medical Centers' Health Plan did "not include Leon's five clinics, which tend to be palatial, with bubbling fountains and marble bathrooms in some." (Docket No. 58-5 at 1). Two years later, on October 2, 2009, the Miami Herald business section reported that Leon was expanding by adding two centers, describing

10

a "huge expansion [that] comes at a time when lawmakers in Washington are debating healthcare reform, including ways to reduce cost." (Docket No. 58-6 at 4). The article described the Leon Medical Clinics as being based upon "the model of healthcare in pre-Castro Cuba." The article observed that "[v]ans pick up and drop off patients at no charge," that the "Leon system strongly emphasizes customer service," that "[a] white-gloved doorman greets patients, and the newest clinics have bubbling fountains in the lobby, and that, "[w]hile waiting to see their doctors, the seniors can chat over *cafecitos* and *pastelitos*." (Id.).

## II. LEGAL DISCUSSION

Defendants move to dismiss, arguing that Relator's claims are barred by the public disclosure bar of the False Claims Act. They also contend that the First Amended Complaint does not satisfy the particularity requirement of Fed. Civ. P. 9(b), nor does it state a claim upon which relief can be granted under Fed. R. Civ. P. 12(b)(6). Like the court in Humana, Inc. that addressed similar claims against other South Florida medical clinics, the Court agrees with Defendants' first argument, and will dismiss the First Amended Complaint under the public disclosure bar.

### A.

Under the False Claims Act, a person who submits false claims to the federal government can be assessed civil penalties and triple damages. 31 U.S.C. § 3729(a)(7). This includes "[a]ny person who . . . knowingly presents, or causes to be presented, . . . a false or fraudulent claim for payment or approval," id. § 3729(a)(1), any person who "knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved," id. § 3729(a)(2), and any person who "knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property

11

to the Government," id. § 3729(a)(7). The Act "reaches claims submitted by health-care providers to Medicare and Medicaid – indeed, one of its primary uses has been to combat fraud in the health care field." Chesborough v. VPA P.C., 655 F.3d 461, 466 (6th Cir. 2011).

Where, as here, "the government declines to intervene in an action, the relator may proceed independently and be awarded a 'reasonable amount' – between 25 and 30 percent – of any proceeds or settlement, along with costs and reasonable attorney's fees." Id. Such rewards are meant "to encourage whistleblowers to act as private attorney-generals in bringing suit for the common good." Walburn v. Lockheed Martin Corp., 431 F.3d 966, 970 (6th Cir. 2005). However, the FCA abjures parasitic lawsuits, that is, suits in which "would-be relators merely feed off a previous disclosure of fraud." Id.

To prevent opportunistic relators, the False Claims Act places jurisdictional limitations on *qui tam* actions, including, so far as relevant here, the "public disclosure bar." In its present incarnation,[9] the public disclosure bar provides:

> (4)(A) The court shall dismiss an action or claim under this section, unless opposed by the Government, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed–
>
> > (i) in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party;
> >
> > (ii) in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or
> >
> > (iii) from the news media,
>
> unless the action is brought by the Attorney General or the person bringing the action

---

[9] Changes to the False Claims Act were made by the Patient Protection and Affordable Care Act ("PPACA"), enacted on March 23, 2010.

12

is an original source of the information.

31 U.S.C. § 3730(4)(A).[10]

"For *qui tam* actions to be barred by a prior 'public disclosure' of the underlying fraud, the disclosure must have (1) been public, and (2) revealed the same kind of fraudulent activity against the government as alleged by the relator." United States *ex rel.* Poteet v. Medtronic, Inc., 552 F.3d 503, 511 (6th Cir. 2009). If there has been a public disclosure and if the *qui tam* complaint raises substantially the same allegations as that already disclosed, the complaint is subject to dismissal, unless the relator is an original source. See, id.; Walburn v. Lockheed Martin Corp., 431 F.3d 966, 974 (6th Cir. 2005); Jones, 160 F.3d at 330.

**B.**

In this case, there is no doubt that there have been public disclosures about what has been characterized as the "Cuban-style of health care" in South Florida, the lavishness of the medical clinics serving Medicare beneficiaries there, and the many services and amenities they provide. Obviously, by the very language of the False Claims Act, the *Miami Herald* is a part of the "news

---

[10] Pre-PAACA, the provision read: "[n]o court shall have jurisdiction over an action based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information." 31 U.S.C. § 3730(e)(4)(A) (2010). The "based upon the public disclosure" differs from the present requirement that it "be substantially the same allegations or transactions as alleged in the action or claim that were publicly disclosed."

Although Relator makes much of the difference in language, the Sixth Circuit, pre-PAACA, repeatedly stated that in determining "whether an action is 'based upon' a public disclosure, a court should look to whether *substantial identity* exists between the publicly disclosed allegations or transactions and the *qui tam* complaint" United States *ex rel.* Jones v. Horizon Healthcare Corp., 160 F.3d 326, 332 (6th Cir. 1998); accord, United States v. A.D. Roe Co., Inc., 186 F.3d 717, 725 (6th Cir. 1999). Thus, pre-PAACA Sixth Circuit cases are instructive regarding whether an allegation is substantially the same as that found in the public disclosure.

13

media," and many court have held that information on readily accessible public websites constitutes public disclosure. See, e.g., United States ex rel. Doe v. Staples, Inc., 2013 WL 1192982 at *3 (D.D.C. Mar. 22, 2013) ("courts broadly construe the channels of public disclsoure . . . to include readily accesible websites"); Humana, Inc., 2012 WL 4479072 at *6 ("various district courts have interpreted [public disclosure] as including disclosure made in newspapers and publicly-accessible websites"); United States ex rel. Green v. Serv. Contract Educ., 843 F.Supp.2d 20, 32-33 (D.D.C. 2012)("[w]hle a website may not be a 'traditional news source,'" a "promotional page" on a website is); United States ex rel. Repko v. Guthrie Clinic, P.C., 2011 WL 3875987 at *7 (M.D. Pa. Sept. 1, 2011) ("The court agrees with those courts from other circuits that have found information contained on publicly available websites can be public disclosures within the meaning of the FCA.").

The pivotal allegations in the First Amended Complaint are substantially the same as the allegations or transactions exposed by the *Miami Herald* and found on the Leon Medical Clinics' website. This Court set out in detail the allegations in the First Amended Complaint, and the reporting by the *Miami Herald*, precisely because they show substantial parallelism.

In fact, in their moving brief, the HealthSpring Defendants provide a side-by-side comparison between the two, and many of the pertinent allegations in the original First Amended Complaint echo, sometimes verbatim, the observations made in the *Miami Herald* reports, or found on the website. This includes, but is not limited to, Miami-Dade County having an extremely high Medicare cost compared to the rest of the nation, the use of white-gloved doorman, the availability of free and unlimited transportation services (including the sizeable fleet equipped with color televisions), and the fact that such amenities are, in reality, paid by the taxpayer. Further, many allegations relating to free transportation provided by the Leon Medical Clinics are public

disclosures found on Leon's website and quoted verbatim in the First Amended Complaint.

It is true that no one specifically accused Leon Medical Clinics of fraud, even though Mr. Shepherd observed that Medicare fraud was rife in South Florida. However, "[t]he words fraud or allegation need not appear in the disclosure for it to qualify" under the public disclosure bar. Dingle v. Bioport, 388 F.3d 209, 214, (6th Cir. 2004) (citing, Jones, 160 F.3d at 332). "Nor does the allegation have to be exactly what Relators allege." Id. (citing United States *ex rel.* McKenzie v. BellSouth Tele. Inc. , 123 F.3d 935, 940 (6th Cir. 2004)). "So long as the government is put on notice to the potential presence of fraud, even if the fraud is slightly different than the one alleged in the complaint, the *qui tam* action is not needed." Id. at 214-15. Moreover, "the information suggesting fraud need not even come from the same source as long as the different sources 'together provide information that leads to a conclusion of fraud.'" Poteet, 552 F.3d at 514.

Relator's underlying premise is that Defendants fraudulently induced Medicare beneficiaries to enroll in, or remain enrolled in, the Medicare Advantage plan by offering the benefit of free food and transportation. Yet the very essence of the string of articles in the *Miami Herald* reveals as much. As noted, those articles state that Defendants (and others) provide elaborate treatment and offer free amenities to Medicare beneficiaries, discuss the inflated costs of healthcare in South Florida, and link some of those costs to the luxurious benefits the recipients receive, benefits which are intended to "make the patient feel good," but are paid for by the taxpayers. In short, a "substantial identity exists between the publicly disclosed allegations" in the *Miami Herald* and Relator's complaint, and are more than sufficient "'to put the government on notice of the possibility of fraud.'" Id. at 513 (quoting, United States *ex rel.* Gilligan v. Medtronic, 403 F.3d 386, 390 (6th Cir. 2005).

In opposing Defendants' motions, Relator argues that "the essential theory of liability is that Defendants knowingly violated the [Anti-Kickback and Anti-Inducement statutes] by offering as an inducement free food and transportation for non-medical purposes in quantities and with values beyond that permitted by the safe harbor exceptions" to the statutes. (Docket No. 66 at 16). Relator then goes on to argue:

> The information Defendants placed in the public domain is misleading and deceptive in that it suggests that full meals are nothing more than "snacks," that transportation is limited to that required for medical appointments, and that both snacks and transportation are "supplemental benefits" legally provided under HealthSpring's Medicare Advantage plans, when in fact the kickbacks and inducements offered by the Leon Defendants – complete meals and non-medical transportation for purposes other than medical appointments – cannot be offered as a "supplemental benefit" under any Medicare Advantage plan. Deceptive disclosures by Defendants casting themselves, and their business model, in a favorable light simply do not constitute disclosures of the essential "allegations or transactions" of Relator's First Amended Complaint.

(Id. at 17).

Similar arguments were raised by Relator and rejected by the court on reconsideration in Humana, Inc. There, Relator argued that the public disclosure "bar does not apply where the disclosures at issue do not allege that the defendants 'actually engaged in wrongdoing,'" and that the disclosures only revealed that defendants "offered gifts of 'nominal' value to potential Medicare enrollees – i.e., conduct that, on its face, would appear to be protected under one of the several statutory safe-harbors." Humana, Inc., 2013 WL 394877 at *1. Rejecting that argument, the court noted that the Anti-Kickback and Anti-Inducement statutes "are implicated upon the mere offering of remuneration," and, therefore,

> it follows that the public disclosures cited by Defendants—which reveal that Defendants offer existing and prospective Medicare recipients free unlimited transportation, free food, and free salon services – were sufficient to bring the Defendants' fraud to the Government's attention. For the bar to apply, it is not

16

> necessary, as Relator contends, that the disclosed information definitively establish that Defendants in fact "committed fraud" or that there was an "illegal purpose" to Defendants' activities. . . . To so hold would establish an impossibly high threshold for application of the public disclosure bar—a threshold that would undermine Congress's expressed concern of preventing "parasitic" lawsuits.

Id. This Court agrees with that analysis as it is in keeping with the Sixth Circuit's teaching that the publicly disclosed allegations need only be sufficient to place the Government on notice about the possibility of fraud. See, Poteet, 552 F.3d at 513, Gilligan, 403 F.3d at 390.

When pressed at oral argument to explain what newness is revealed by the claims in this Court, counsel for Relator pointed to the lead article in the March 12, 2007, "Business Monday" section wherein Mr. Leon is quoted as saying that "his clinics offer no exercise or dominoes – and never will" because "[w]e take the dollars and put them into healthcare." (Docket No. 58-1 at 7). Counsel understood this to be some sort of "condemnation" of his competitor's practices, that Mr. Leon was expressing a "judgment" about what his competitors were offering, and that he disavowed his competitors' practices, all of which has been dispelled by Relator's "research." However, Mr. Leon's statement would hardly throw investigators off the scent, particularly because in the very next sentence his competitor is said to have "thought of the Leon clinics elaborate' entrances and responded: 'Well healthcare – and waterfalls.'" (Id.).

### C.

A *qui tam* action is not precluded, even where there has been a public disclosure, if the relator is an "original source." See, Walburn, 431 F.3d at 974; Jones, 160 F.3d at 330. An "'original source' means an individual who either (i) prior to a public disclosure under subsection (e)(4)(a), has voluntarily disclosed to the Government the information on which allegations or transactions

in a claim are based, or (2) who has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the Government before filing an action under this section." Id. § 3730(4)(B).[11]

In this case, Relator is not an original source. He does not suggest that he presented to the Government information prior to the public disclosure in the *Miami Herald* and on Defendants' website – something which would have been hard to do since much of the First Amended Complaint is founded on those sources. This also plays into the second reason Relator is not an original source: he adds nothing that is independent of, and materially adds to, the disclosures that had already been made. The fact that medical clinics in South Florida (including the Leon Medical Clinics) was offering free food, free transportation and other non-medical amenities were widely known by virtue of the *Miami Herald's* coverage. That the free food provided may have included more than a snack, and/or free rides sometimes involved transportation beyond the medical clinic is a matter of degree, and of little moment given that the Anti-Kickback statute prohibits knowingly offering remuneration that is "likely to influence such individual to order or receive from a particular provider . . . any item . . or service[.]" 42 U.S.C. § 1320a-7(a). As the court in Humana Inc. stated:

> . . . Relator fails to persuade the Court that the allegations about which he claims to have independent knowledge materially add to the information already in the public domain. Standing alone, facts such as the value of the meals provided by the Clinics to their patients, or the number of passengers who use the Clinics' vans, whether to a physician appointment or anywhere else, cannot form the basis of a claim under the [Anti-Kickback and Anti-Inducement statutes]. The relevance of this information is *necessarily dependent upon* the fact that these services were offered to Medicare enrollees and the fact that they were free. Thus, while the information revealed in Relator's investigation may prove critical to overcoming Defendants' affirmative

---

[11] Pre-PAACA, an "original source" for purposes of the statute meant "an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information." Id. § 3730(e)(4)(B).

defenses, it is not necessary to alert the Government to fraud that otherwise would have gone unnoticed. This, after all, is the purpose of the *qui tam* provisions.

Humana, Inc., 2012 WL 4479072 at *12 (emphasis in original).

**D.**

The Sixth Circuit has stated that whether to dismiss a complaint with prejudice is a matter of discretion, but that "'where a more carefully drafted complaint might state a claim, a plaintiff must be given at least one chance to amend the complaint before dismissing the action with prejudice.'" United States *ex rel.* Bledsoe v. Comm. Health Sys., Inc., 342 F.3d 634, 644 (6th Cir. 2003) (quoting, EEOC v. Ohio Edison Co., 7 F.3d 541, 546 (6th Cir. 1993)). Relator has had that opportunity, enlarging the original 22-page, 157-paragraph Complaint, to a 58 page, 298-paragraph First Amended Complaint. Moreover, the False Claims Act requires that a "copy of the complaint and written disclosure of substantially all material evidence and information the [relator] possesses shall be served on the Government" for its review, 31 U.S.C. § 3730(b)(2). Counsel for Relator has declared that "all material evidence relevant to his complaint" has previously been disclosed to the Government, and there is no suggestion that the First Amended Complaint omits any of the information thus disclosed. As such, it would be futile to allow another amendment, and, accordingly, this case will be dismissed with prejudice.

**III. CONCLUSION**

On the basis of the foregoing, Defendants' Motions to Dismiss will be granted, and this action will be dismissed with prejudice. Defendants' Motion to Strike will be denied.

An appropriate Order will be entered.

                                                           _____
                                                           KEVIN H. SHARP
                                                           UNITED STATES DISTRICT JUDGE